Terri L. **STEFFEN,** et al. Plaintiffs,

v.

**GRAY, HARRIS & ROBINSON, P.A. d/b/a Gray Harris Robinson Shackleford Farrior and Geoffrey T. Hodges, Defendants.**

No. 802CV1462T30TGW.

United States District Court,
M.D. Florida,
Tampa Division.

Sept. 19, 2003.

---

David A. Maney, Maney, Damsker, Harris & Jones, P.A., Harley Edward Riedel, II, Stichter, Riedel, Blain & Prosser, P.A., Tampa, FL, for Terri L. Steffen, Plaintiffs.

Frank H. Gassler, Katherine C. Lake, Fowler White Boggs Banker, P.A., Tampa, FL, for Gray Harris & Robinson, P.A. dba Gray Harris Shackleford Farrior, Geoffrey T. Hodges, Defendants.

## ORDER

MOODY, District Judge.

THIS CAUSE comes before this Court upon Defendants' Motion for Summary Judgment and memorandum of law (Dkts.# 43, 44) and Plaintiff's response (Dkt.# 55) thereto.[1] Defendants filed a reply (Dkt.# 66), and at this Court's request both parties filed supplemental memoranda (Dkts.# 78, 85). In addition, Defendants filed a Motion to Strike Steffen's Third Declaration in Opposition to Motion for Summary Judgment (Dkt.# 90) and Plaintiffs filed a response (Dkt.# 92) thereto. After close consideration, this Court concludes that summary judgment should be granted because Terri L. Steffen is unable to show any alleged negligence by Defendants proximately caused her damages.

## I. BACKGROUND

This is a legal malpractice action, arising out of a lengthy litigation odyssey between Paul A. Bilzerian[2] and the Securities and

---

1. Defendants moved for summary judgment on two grounds. At oral argument, this Court denied Defendants' motion for summary judgment on the ground that the statute of limitations expired. This Order does not address that issue, but this Court again states that it denies the motion on that ground for the reasons stated at oral argument.

2. This Court previously determined that Bilzerian was a necessary party to this litigation. While Bilzerian was added as a nominal plaintiff in this action, he has never asserted any claim for legal malpractice against Defendants. Bilzerian has participated in this action and argued against entry of summary judgment. To the extent that Bilzerian has any claim against Defendants, summary judg-

Exchange Commission (the "SEC"). Bilzerian is the husband of Steffen. In 1989, Bilzerian was convicted of securities fraud.[3] In 1991, the SEC obtained summary judgment against him in a separate civil action and later a disgorgement order for over sixty two million dollars.[4] Then in 1991, Bilzerian filed for bankruptcy after transferring most of his interests in jointly owned assets to his wife, Steffen, in her individual name. Bilzerian (and Steffen for a brief time in the bankruptcy court) battled the SEC and other creditors in the bankruptcy court, the district court, and the United States Court of Appeals for the Eleventh Circuit. The litigation related to Bilzerian's bankruptcy ended in 1998. In 2000, the SEC obtained an order holding Bilzerian in civil contempt. In 2001, the D.C. Court froze the assets of Bilzerian, his family (including Steffen), and several family friends and incarcerated Bilzerian. In 2002, Steffen settled with the SEC to obtain the release of Bilzerian from prison and of her previously frozen assets.

During this litigation odyssey in 1994–1995, Steffen and Bilzerian employed Defendants for estate planning and asset protection purposes. On the advice of Defendants, Steffen and Bilzerian transferred into the direct or indirect control of a foreign self-settled trust (the "Trust") almost all of their property, including: (1) a piece of real property located in Crosslake, Minnesota, held by Steffen, individually (the "Minnesota Property");[5] (2) Steffen's and Bilzerian's homestead held jointly by the parties (the "Homestead"); (3) another piece of real property located in Tampa, Florida, held jointly by the parties (the "Taray Property");[6] and (4) Bicoastal Holding Corporation ("BHC") stock (the "Bicoastal Stock") held jointly. At the time that the Trust was formed, BHC appears to have had at least 600,000 options and/or warrants for Cimetrix, Inc. ("Cimetrix") stock, which were later exercised.[7]

Steffen claims that the transfer of this property to the Trust subjected her assets

ment is granted because Bilzerian cannot show but for Defendants' alleged malpractice he would not have suffered damages.

3. In September 1989, Bilzerian was convicted of securities fraud and conspiracy to defraud the United States. Subsequently, the Second Circuit affirmed his conviction and the Supreme Court denied certiorari. *See United States v. Bilzerian*, 926 F.2d 1285 (2d Cir.), *cert. denied* 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991).

4. During his criminal case in June 1989, the SEC filed a civil suit for securities fraud in the United States District Court for the District of Columbia (the "D.C. Court"). In April 1991, the SEC sought and received partial summary judgment against Bilzerian. The D.C. Court held Bilzerian liable for securities fraud based on the collateral estoppel effect of his criminal conviction. *SEC v. Bilzerian*, 1991 WL 83964 (D.D.C.1991), *aff'd* 29 F.3d 689 (D.C.Cir.1994). In 1993, the D.C. Court ordered Bilzerian to disgorge $33,140,787.07 and another $29,196,812.46 in prejudgment

interest for a total judgment of $62,337,599.53.

5. In June 2000, the Minnesota Property was sold for $2,800,000. OHLP loaned $1,000,000 of the sale proceeds to a family friend, Ernie Haire, III, and purchased another piece of property for $450,000.

6. Steffen claims that the transfer of this property in June 1994, from her individually to her and Bilzerian was a mistake. She has not alleged that the "mistake" constituted malpractice by Defendants.

7. BHC may have also had some compensation from Cimetrix pursuant to consulting agreements for Bilzerian's and/or Steffen's services. Subsequent to the creation of the Trust, other assets may have been transferred to and/or through BHC, including the proceeds from the sale of the Taray Property and the continued compensation from Cimetrix for Bilzerian's and Steffen's consulting services.

to a direct claim by the SEC. She settled that claim in 2002, and allegedly lost over fifty percent of that property to the SEC. Steffen alleges that Defendants committed legal malpractice when Defendants advised her to establish the Trust and transfer her property. Before reaching the merits of Defendants' motion, some more detailed factual background is required.

## A. INITIAL TRANSFERS

In February 1991, while the SEC's motion for summary judgment was pending in the original civil enforcement action, Bilzerian transferred his interest to Steffen in the Minnesota Property that he and Steffen previously owned jointly. In May 1991, after summary judgment was granted in the civil enforcement action, Bilzerian transferred to Steffen his interests in the Homestead and Taray Property, which the couple also had previously owned jointly. In other words, Bilzerian divested himself of almost all of his assets, except for his interest in the Bicoastal Stock, as the SEC attempted to obtain a disgorgement order against him.[8]

## B. BILZERIAN'S BANKRUPTCY

In August 1991 (approximately three months after purportedly transferring almost all of his assets to his wife), Bilzerian filed for bankruptcy in the United States Bankruptcy Court for the Middle District of Florida. Bilzerian sought to discharge any claim of the SEC as well as several other sizeable judgment creditors.

■ The SEC filed a dischargeability action against Bilzerian, seeking to prevent the discharge of the SEC's disgorgement claim.[9] Bilzerian filed a motion to dismiss the SEC's action, claiming that the SEC did not have standing to bring a dischargeability action. The bankruptcy court agreed and dismissed the SEC's dischargeability action with prejudice. The SEC appealed, and in May 1995, the district court reversed. *See SEC v. Bilzerian (In re Bilzerian)*, 1995 WL 934184 (M.D.Fla.1995).[10]

On remand, the SEC sought summary judgment, arguing collateral estoppel barred the discharge of the disgorgement

---

8. Bilzerian listed his interest in the Bicoastal Stock as having a value of $0 in his bankruptcy.

9. In addition to heavily litigating the dischargeability proceeding, Bilzerian attempted to prevent the entry of the disgorgement order and the order regarding prejudgment interest, asserting that such actions violated the automatic stay in his bankruptcy case. The bankruptcy court held that the SEC's actions seeking the disgorgement order did not violate the automatic stay because governmental regulatory actions were expressly excepted from the automatic stay. *See Bilzerian v. SEC (In re Bilzerian)*, 146 B.R. 871 (Bankr.M.D.Fla. 1992).

10. While this Court cites to the many various reported opinions involving Bilzerian's various cases against the SEC, it is only taking judicial notice of the dates, the judicial acts taken, and the subject matter of the various cases, and not the findings of fact made in

those cases. *See United States Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275, (11th Cir.2001); *United States v. Jones*, 29 F.3d 1549, 1554–55 (11th Cir.1994).

In addition, this Court will consider the arguments and statements made in filings and declarations by the SEC, Steffen and Bilzerian in the many different matters (especially the civil contempt proceeding). This Court is not using those statements for the truth of the matters asserted therein (except when the statements are admissions by a party), but is instead using them to illustrate what those parties' positions were in each of those cases. Such statements and arguments are relevant in a legal malpractice action because the causation element depends on a finding that but for the attorney's advice, drafting, etc., the client would have been successful at achieving their objective or would not have been damaged.

order. The bankruptcy court denied the SEC's motion and *sua sponte* granted summary judgment to Bilzerian. In October 1996, the district court again reversed the bankruptcy court and entered summary judgment in favor of the SEC, concluding that the disgorgement order was nondischargeable. *See SEC v. Bilzerian (In re Bilzerian)*, 1996 WL 885850 (M.D.Fla.1996), *aff'd* 153 F.3d 1278, *reh'g en banc den.* 166 F.3d 355 (11th Cir. 1998).[11]

## C. ADVERSARY PROCEEDING AGAINST STEFFEN

In addition to the dischargeability action, the trustee of Bilzerian's bankruptcy case brought an adversary proceeding against Steffen, seeking in part to avoid the real property transfers from Bilzerian to Steffen.[12] In October–November 1993, Steffen and the trustee negotiated a settlement of the trustee's claims against the estate (the "Release"). The Release stated that Steffen (and the three pieces of real property and the BHC stock) were released from "all claims, demands, suits, causes of action, or liabilities whatsoever, legal or equitable, known or unknown, now existing or hereafter arising that have been, could have been or could be asserted as a result of the transfer of any assets of the estate."[13] The Release purported to be on behalf of "all creditors of [Bilzerian's] bankruptcy estate."

In November 1993, the trustee, Bilzerian, and Steffen sought court approval of the settlement. The SEC objected to the settlement, arguing, in relevant part, that the Release language was too broad and purported to release their fraudulent transfer claims against Steffen. On January 4, 1994, the bankruptcy court overruled the SEC's objections, but required language to be inserted into the Release substantially narrowing what actions were being released. The language inserted reads that:

> This release shall not operate to release non-bankruptcy causes of action, if any, which are available to Creditors against Bilzerian and/or Steffen under any applicable non-bankruptcy law; is limited to the powers of a trustee uniquely granted to a trustee under 11 U.S.C. §§ 544(a) and (b), 547, and 548; and shall have no effect on adversary proceedings 92–502, 92–573, and 93–822, all now pending in the United States Bankruptcy Court for the Middle District of Florida.

On February 23, 1994, the bankruptcy court granted the motion to compromise, overruled the SEC's objections, and approved the settlement and the form of the Release with the inserted language.

## D. POST RELEASE TRANSFERS

In June 1994 (a couple of weeks after the bankruptcy settlement was finalized), Steffen transferred ownership of the Homestead and Taray Property back to her and Bilzerian jointly.[14] The transfer

---

**11.** Bilzerian also filed a case in the United States District Court for the Middle District of Florida, seeking relief from the nondischargeability judgment asserting the judgment was procured by fraud upon the court. The district court dismissed Bilzerian's complaint and the Eleventh Circuit affirmed. *See Bilzerian v. SEC*, 208 F.3d 1011, *reh'g en banc den.* 213 F.3d 650 (11th Cir.2000).

**12.** The trustee also objected to Bilzerian's exemptions, which included Bilzerian's interest in the Bicoastal Stock.

**13.** The Release also resolved the trustee's objection to Bilzerian's exemptions.

**14.** Steffen claimed in her deposition that the transfer of the Taray Property back into her and Bilzerian was a mistake by her (for signing it) and Defendants (for preparing the deed). Steffen has not claimed that this

allegedly occurred because Steffen wanted Bilzerian's help in disputing a property tax assessment on their Homestead which required Bilzerian to be an owner. Despite transferring title into both their names, Bilzerian (by an unrecorded side agreement) agreed Steffen: (1) would get the Homestead Property in the event of divorce; and (2) had the right to demand and compel Bilzerian to transfer his interest in the Homestead at any time.

At around the same time, Cimetrix granted BHC options and/or warrants to purchase 6,000,000 shares of its common stock for $0.16 per share. Bilzerian was the President, Chief Executive Officer, and director of Cimetrix.[15] Bilzerian never directly received a salary from Cimetrix for his services.[16] Instead, BHC entered into annual consulting agreements in which Cimetrix agreed to pay BHC for Bilzerian's services and part of Bilzerian's and Steffen's personal expenses. BHC never paid Bilzerian any salary either, but did grant Bilzerian and Steffen a dividend of the options and/or warrants of 5,400,000 shares of Cimetrix stock and also paid part of Bilzerian's and Steffen's personal expenses.[17]

## E. ESTABLISHMENT OF THE TRUST AND RELATED ENTITIES

In 1994, Steffen went to Defendants for estate planning and asset protection pur-

poses. Defendants advised Steffen to transfer her property into a complex ownership structure of family owned trusts, companies, and partnerships. On December 29, 1995, Steffen and Bilzerian established a foreign self settled trust in the Cook Islands. From the date of its establishment until December 1998, Bilzerian served as both a trustee and a beneficiary.

By 1997, the Trust held or controlled all of Steffen and Bilzerian's assets. In December 1995, Bilzerian and Steffen transferred all their BHC stock as well as the option to purchase 3,000,000 shares of Cimetrix stock to the Trust. In addition, the Trust owns 100% of the shares of BHC, and is the limited partner of and holds a 99% interest in Overseas Holding Limited Partnership ("OHLP"). OHLP is a Nevada limited partnership to which in 1995 Steffen and Bilzerian transferred their interests in the Taray and Minnesota properties.[18] In March 1997, Steffen and Bilzerian transferred the Homestead (their last significant asset) to OHLP.[19]

## F. BILZERIAN'S CIVIL CONTEMPT

In December 1997, Bilzerian received his discharge from his bankruptcy. The dischargeability of the SEC's claim, however, was not definitively determined until September 1998, when the Eleventh Cir-

transfer constituted malpractice by Defendants.

15. Bilzerian became president of Cimetrix right before the options were granted to BHC.

16. Steffen also worked for Cimetrix and had a similar consulting arrangement.

17. The BHC stock was held jointly by Steffen and Bilzerian, and had been listed as valueless in Bilzerian's bankruptcy schedules. It is not clear what the value of the options or warrants were in 1994. According to Bilzeri-

an in his deposition (Bilzerian is one of Steffen's valuation experts), the Cimetrix stock, which was obtained when the Bilzerian related entities exercised the options or warrants, had value of $47,000,000 in January 2001.

18. At the time that he signed the deeds, Bilzerian purportedly held no interest in either piece of real property.

19. Bilzerian and Steffen failed to record the transfer of the Homestead until January 1999, in the middle of the civil contempt proceedings.

cuit affirmed the district court's determination that the disgorgement orders were nondischargeable. *See SEC v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, *reh'g en banc den.* 166 F.3d 355 (11th Cir.1998). In November 1998, the SEC sought for the first time to hold Bilzerian in contempt for his failure to comply with the disgorgement order. In December 1998, the trust protector (Bilzerian's sister-in-law) removed Bilzerian as a beneficiary and trustee of the Trust because of the pending contempt proceeding.[20]

Nearly two years later in August 2000, the D.C. Court held Bilzerian in contempt and required Bilzerian to make monthly payments of $5,000 and provide an accounting of his assets. In December 2000, the D.C. Court appointed a receiver over Bilzerian's assets, including the Trust. In January 2001, Bilzerian filed his second bankruptcy in the United States Bankruptcy Court for the Middle District of Florida, seeking to prevent the receiver from taking possession of the Trust's assets. In January 2001, in response to Bilzerian's second bankruptcy and his non-compliance with its August 2000, order, the D.C. Court incarcerated Bilzerian.

In March–June 2001, the D.C. Court in a series of orders froze the assets of the Trust, BHC, OHLP, and several other trusts related to Bilzerian, Steffen, and their friends and families.[21] The D.C. Court's June 1, 2001, Order found that the SEC made a sufficient showing that Bilzerian had an interest in the assets of those entities to justify an asset freeze to prevent dissipation.

Steffen filed a personal bankruptcy as a result of the freeze order. Her bankruptcy did not, however, interrupt the freeze order. With her husband in jail and her assets frozen, Steffen negotiated a settlement with the SEC to end the asset freeze and get her husband out of jail. In December 2001, Steffen and the SEC reached an agreement, and that settlement became binding when it became a final judgment in January 2002.

### G. THIS ACTION

On May 6, 2002, Steffen filed this action for legal malpractice. In the one count amended complaint, Steffen alleges that as a result of Defendants' negligent legal advice she suffered losses of more than ten million dollars. Steffen does not allege in her amended complaint that there was any error or omission in any document created by Defendants. Instead, she alleges that Defendants negligently failed to advise her that creation of the Trust and transfer of her assets to it and its related entities would allow her husband's creditors to reach her assets.

### II. SUMMARY JUDGMENT STANDARD

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

---

**20.** The order to show cause issued by the D.C. Court triggered a duress provision in the Trust, which removed him as a trustee and beneficiary from the Trust. Steffen, likewise, was removed as a trustee. Steffen retained her status as a beneficiary. Steffen's parents initially took over as trustees of the Trust.

**21.** In addition, the D.C. Court froze Cimetrix securities that were in the name of Ernest B. Haire III, who was the son of Bilzerian's neighbor and friend. The June 1, 2001, Order not only reaffirmed the earlier May 11, 2001, Order, but it also required these entities to turn over their assets, including cash in their accounts, to the registry of the Court.

law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *See id.* Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in her favor. *See id.* at 255, 106 S.Ct. 2505.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The evidence must be significantly probative to support the claims. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *See Fernandez v. Bankers Nat'l Life Ins. Co.,* 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Hoffman v. Allied Corp.,* 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. *See Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir. 1989).

## III. LEGAL ANALYSIS

 Defendants are entitled to summary judgment because Steffen cannot show that any negligence by Defendants caused her damage. Under Florida law,[22] a plaintiff seeking to prevail on a legal malpractice claim must show: (1) the attorney's employment; (2) the attorney's neglect of a reasonable duty; and (3) the attorney's negligence resulted in and was the proximate cause of a loss suffered by the plaintiff. *See Kates v. Robinson,* 786 So.2d 61, 64 (Fla. 4th DCA 2001); *Hold v. Manzini,* 736 So.2d 138, 142 (Fla. 3d DCA 1999); *Tarleton v. Arnstein & Lehr,* 719 So.2d 325, 328 (Fla. 4th DCA 1998) (per curiam). The third element, the causation element, requires that the plaintiff demonstrate but for a defendant's malpractice she would not have suffered a loss. *See Tarleton,* 719 So.2d at 328. This causation element typically causes a " 'trial within a trial.' " *Id.*

**22.** In this case, this Court's jurisdiction is based upon diversity, 28 U.S.C. § 1332, and this case arises under Florida law. In diversity cases arising under Florida law, a federal court is bound by the law articulated by the Florida Supreme Court. *See Shapiro v. Associated Int'l Ins. Co.,* 899 F.2d 1116, 1118 (11th Cir.1990). If the Florida Supreme Court has not spoken on an issue, Florida District Court of Appeals decisions control absent persuasive indication that the Florida Supreme Court would rule otherwise. *See Blanchard v. State Farm Mut. Auto. Ins. Co.,* 903 F.2d 1398, 1399 (11th Cir.1990). If there is no authority, this Court is to make an "educated guess" as to how a Florida court would rule. *See Shapiro,* 899 F.2d at 1118–19.

It is this causation element upon which Defendants move for summary judgment. Plaintiff conceded at oral argument that if the SEC or the D.C. Court could have reached the assets prior to formation of the Trust, she could not demonstrate that any alleged malpractice was the proximate cause of her loss.

## A. DISGORGEMENT ORDERS, CIVIL CONTEMPT, AND ASSET FREEZES

■ The damages that were suffered by Steffen were caused when Bilzerian was held in civil contempt for violating the 1993 disgorgement order. Disgorgement orders operate to "wrest[ ] ill-gotten gains from the hands of a wrongdoer." *Commodity Futures Trading Comm'n v. American Metals Exchange Corp.*, 991 F.2d 71, 76 (3d Cir.1993). A disgorgement order is more like an injunction for the public interest than a money judgment. *See SEC v. Huffman*, 996 F.2d 800, 802–03 (5th Cir.1993). It is this feature, the similarity to an injunction, that allows disgorgement orders, unlike judgments, to be enforced by civil contempt. *See id.*

■ A district court has broad discretion in fashioning a disgorgement order. *See id.* For example, a district court can ignore state law exemptions as well as other state law limitations on the ability to collect a judgment in fashioning a disgorgement order. *See id.; SEC v. Hickey*, 322 F.3d 1123, 1131 (9th Cir.2003); *SEC v. AMX, Int'l, Inc.*, 872 F.Supp. 1541, 1544–45 (N.D.Tex.1994) (homestead exemption not taken into account); *SEC v. Musella*, 818 F.Supp. 600, (S.D.N.Y.1993) (holding exemptions from attachment under New York law did not alter a person's duty to pay under a disgorgement order); *also Pension Benefit Guaranty Corp. v. Oui-met Corp.*, 711 F.2d 1085, 1093 (1st Cir. 1983) (ignoring state law limitations on alter ego theory in ERISA context). This ability to ignore state law limitations and exemptions exists so that state law cannot defeat or limit the scope of remedial orders under federal law. *See Hickey*, 322 F.3d at 1131.

■ In addition to the tremendous discretion that a district court has to fashion a disgorgement order, a district court has both inherent and statutory power to enforce compliance with its orders through use of civil contempt. *See Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). Appellate courts review civil contempt rulings for an abuse of discretion. *See McGregor v. Chierico*, 206 F.3d 1378, 1385–86 (11th Cir. 2000); *FTC v. Affordable Media, LLC*, 179 F.3d 1228,1239 (9th Cir.1999).

■ Once a party seeking civil contempt proves by clear and convincing evidence that the contemnor has violated a court order (such as failure to pay), the burden of production shifts to the contemnor to justify non-compliance with the order. *See Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir.1992). While inability to pay is a defense to civil contempt, inability to pay is not a defense if the contemnor created the inability. *See e.g., Hodgson v. Hotard*, 436 F.2d 1110, 1116 (5th Cir.1971); *Piambino v. Bestline Products, Inc.*, 645 F.Supp. 1210, 1215 (S.D.Fla.1986).

A number of courts have concluded that asset freezes, including asset freezes of third parties' assets, are within a court's equitable power to enforce contempt. *See Hickey*, 322 F.3d at 1131.[23] For example,

**23.** *Also SEC v. Cavanagh,* 155 F.3d 129, 136–37 (2d Cir.1998) (freezing wife's bank account that received proceeds from husband's involvement in securities fraud prior to entry of

in *Hickey*, the Ninth Circuit concluded that a district court had the authority to freeze the assets of a corporation owned by a securities law violator's mother. *See id.* at 1131–32. The violator was employed by the corporation, but received no salary. *See id.* at 1131. Instead, the corporation paid all of the violator's personal expenses. *See id.* The Ninth Circuit held that the district court was within its discretion to freeze the assets of the corporation because the violator dominated the corporation. *See id.* at 1132.

Steffen is correct that in *McGregor v. Chierico* the Eleventh Circuit held that a homestead held by tenancy in the entireties could not be reached in a contempt proceeding because the wife was a completely innocent party to the alleged action that constituted the contempt. 206 F.3d 1378, 1385–86 (11th Cir.2000). In *McGregor*, the district court held the McGregors in contempt for violating an injunction against telemarketing. As a result of the contempt, the district court entered a judgment finding that the McGregors and other business associates had caused actual damage in the amount of $7.2 million and ordered them to forfeit most of their assets including the McGregors' homestead. The Eleventh Circuit reversed the order of contempt as to Mrs. McGregor, finding that there was no evidence that she participated in the telemarketing business. The Eleventh Circuit then reversed the forfeiture order because of her rights in the homestead. *See id.* at 1386.

*McGregor*, however, was not controlling on a district court in the District of Columbia. *McGregor* is also distinguishable from the present case—it involved a final judgment, not a disgorgement order. Enforcement of a disgorgement order against property (real or personal) has been treated differently by courts from enforcement of a judgment. Also, unlike in *McGregor*, there was evidence, not even considering the transfers to the Trust, that: (a) Bilzerian maintained control of or had an interest in his former assets; (b) Bilzerian transferred his interest in the assets to his wife to avoid creditors like the SEC; and (c) Steffen was involved in the transfers.

To enforce a disgorgement order by civil contempt, the SEC needed only to show a failure to pay the amount ordered. Then to avoid contempt, Bilzerian had the burden to establish his inability to pay. Steffen cannot demonstrate that but for the transfers to the Trust Bilzerian could meet this burden. Evidence existed demonstrating that Bilzerian maintained an interest in and control over the property initially transferred. For example, Bilzerian's interest in the Homestead and Taray Property was transferred back to him after the Release was final and while the SEC's dischargeability action had been dismissed with prejudice by the bankruptcy court. At that same time, BHC, a company owned by Bilzerian and Steffen, paid a dividend to Bilzerian and Steffen in stock options or warrants for Cimetrix. Bilzerian was president of Cimetrix, but was not being paid a salary directly until

disgorgement order); *SEC v. Cherif*, 933 F.2d 403, 414 n. 11 (7th Cir.1991) (stating that "[a] court can obtain equitable relief from a non-party against whom no wrongdoing is alleged if it establishes that the non-party possesses illegally obtained profits but has no legitimate claim to them");*SEC v. Pinez*, 989 F.Supp. 325, 337 (D.Mass.1997) (stating a district court has jurisdiction to enter asset freeze order on non-party's assets when the non-party has no legitimate claim to the assets); *SEC v. Comcoa, Ltd.*, 887 F.Supp. 1521, 1524–25 (S.D.Fla.1995) (holding that funds transferred to lawyer's trust account for benefit of defendants were subject to freeze), *aff'd sub nom., Levine v. Comcoa, Ltd.*, 70 F.3d 1191 (11th Cir.1995).

he was held in contempt. BHC, at this time and for years, was paying some of the personal expenses of Bilzerian and Steffen.

This interest in and control over property subject to the disgorgement order supports an asset freeze, contempt order, and order compelling Steffen to disgorge the property lost by Steffen in the settlement. Steffen cannot demonstrate that but for the formation of the Trust she would not have suffered a loss. Accordingly, summary judgment is granted.

## B. THE SEC STILL COULD MAINTAIN A DIRECT CLAIM

Alternatively, this Court concludes that neither the Release executed in Bilzerian's bankruptcy nor the exemption of BHC stock in Bilzerian's bankruptcy prevented the SEC from either seeking to avoid the transfers to Steffen or pursuing some other direct claim against her or her assets.

## 1. THE EFFECT OF THE RELEASE

 Steffen argues that after execution of the Release in 1994 the SEC had no claim to the interest in the property transferred to her alone. Steffen relies on some of the language in the Release to support her argument. Defendants cite to both the remaining language of the Release and the transcript of the bankruptcy hearing approving the settlement to argue

that the Release did not preclude the SEC from bringing a fraudulent transfer action against Steffen.

 Under Florida law, interpretation of a release is to be guided by the general principles governing contract construction. See Hold v. Manzini, 736 So.2d 138, 141 (Fla. 3d DCA 1999). If the language of the release is clear and unambiguous, a court is to construe the terms according to its plain meaning. See id.

 In this case, the language of the Release is clear and unambiguous. The Release states "[t]his release shall not operate to release non-bankruptcy causes of action, if any, which are available to Creditors against Bilzerian and/or Steffen under any applicable non-bankruptcy law." The trustee only released his claims that were uniquely his in the bankruptcy case and not those of the SEC or any other creditor of Bilzerian whose claim was not discharged by his bankruptcy. Florida law allows a creditor like the SEC to bring a fraudulent transfer action to set aside a constructively or actually fraudulent attempt to hide assets.[24] See Fla. Stat. § 726.101, et seq.

The SEC successfully brought a similar action with a similar transferee in similar circumstances under New Jersey's almost identical version of the Uniform Fraudulent Transfer Act. SEC v. Antar, 120 F.Supp.2d 431 (D.N.J.2000). In Antar,

---

**24.** Steffen also argues that any interest that Bilzerian had in the fraudulently transferred property went to the trustee upon his bankruptcy filing. The United States Court of Appeals are divided on whether a fraudulent transfer action is property of the estate. Compare In re Colonial Realty Co., 980 F.2d 125, 131–32 (2d Cir.1992) (holding that such actions are not property of the estate); with American Nat'l Bank of Austin v. MortgageAmerica Corp., 714 F.2d 1266, 1275–77 (5th Cir. 1983) (holding such actions are property of the estate). This Court concludes that such

an action is not property of the estate because to construe Section 541(a)(1) in such a manner would render Section 541(a)(3) to be superfluous. 11 U.S.C. §§ 541(a)(1), (a)(3).

Even though this Court has concluded that the fraudulent transfer action was not property of the estate, the automatic stay barred the SEC from seeking avoidance of the transfers until the stay was lifted or terminated. See, e.g., Colonial Realty, 980 F.2d at 131–32 (holding stay barred creditor's action); MortgageAmerica, 714 F.2d at 1275–77 (holding same).

the securities law violator transferred assets to his wife and son prior to the SEC obtaining a disgorgement order, including the husband's interest in a homestead in Florida. *See id.* at 444–46. The court in that case granted summary judgment to the SEC against the wife and son and held that the SEC could reach and levy on the homestead. *See id.* at 448–51. Accordingly, the SEC had the ability after the Release to file suit against Steffen to avoid the transfers of the Homestead, the Taray, and the Minnesota Property.

## 2. EXEMPTION OF THE BHC STOCK

 Steffen next claims that the exemption in bankruptcy of the Bicoastal Stock would have prevented the SEC from reaching the assets of BHC.[25] Steffen is correct that property exempted during Bilzerian's bankruptcy case (Bilzerian's interest in the Bicoastal stock) would not be subject to debts that arose prior to his bankruptcy case (the SEC disgorgement order).[26] *See* 11 U.S.C. § 522(c). Nothing in the plain language of Section 522(c) would exempt, however, the SEC's ability to seek disgorgement against assets held by BHC, if they were ill gotten gains from Bilzerian's securities fraud. Similarly, Section 522(c) does not allow Bilzerian or Steffen to protect other non-exempt assets or their proceeds by transferring those assets or proceeds to or through BHC after the filing of Bilzerian's bankruptcy.

 At the time when Bilzerian's bankruptcy was filed, his interest in the Bicoastal stock was purportedly valueless. Thereafter, he transferred to BHC: (a) Cimetrix warrants and/or options for 6,000,000 shares of Cimetrix stock; (b) proceeds from the sale of the Taray Property; (c) his and his wife's post-bankruptcy compensation for consulting for Cimetrix; and (d) other assets bought and sold by BHC with assets transferred into BHC. Section 522(c) protects none of this property because Bilzerian did not list any of this property as exempt in his bankruptcy schedules. The D.C. Court, therefore, could have ordered BHC to disgorge its assets and also frozen its assets pending resolution of the contempt proceeding, even without the transfers associated with the Trust, to prevent any additional dissipation by Bilzerian.

It is therefore **ORDERED AND ADJUDGED** that:

1. Defendants' Motion for Summary Judgment and memorandum of law (Dkts. # 43, 44) is **GRANTED**.

2. Defendants' Motion to Strike Declaration in Opposition to Motion for Summary Judgment (Dkt. # 90) is **GRANTED in part and DENIED in part**. Paragraph five of Terri Steffen's Third Declaration is **STRICKEN**. The remaining portions of the Third Declaration remain.

3. The Clerk is directed to enter a judgment in favor of Defendants, close this

---

**25.** Alternatively, Steffen argues that there was no basis for the SEC to go after the assets of a separate entity, BHC, not involved in the original securities fraud. As discussed *infra,* if the D.C. Court could trace proceeds going to BHC instead of Bilzerian or found that Bilzerian was using BHC to protect assets and frustrate the disgorgement order, the D.C. Court could freeze BHC's assets or order it to disgorge its property.

**26.** Section 522(c) states that "[u]nless the case is dismissed, property exempted under this section is not liable during or after the case for any debt of the debtor that arose, or that is determined under section 502 of this title as if such debt had arisen, before the commencement of the case." 11 U.S.C. § 522(c).

case, and terminate all pending motions as moot.