**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Jamie SOLOW, Defendant.**

**Case No. 06–81041–CIV.**

United States District Court, S.D. Florida.

Jan. 15, 2010.

Order Denying Stay Pending Appeal Jan. 22, 2010.

Jane M.E. Peterson, John G. Silbermann, Marsha C. Massey, Securities & Exchange Commission, Washington, DC, for Plaintiff.

Jamie L. Solow, Boca Raton, FL, pro se.

Carl Francis Schoeppl, Jr., Schoeppl & Burke, P.A., Boca Raton, FL, Thomas Franklin Almon, Jr., Miami, FL, for Defendant.

## *ORDER OF CIVIL CONTEMPT*

DONALD M. MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court on Plaintiff, Securities and Exchange Commission's ("SEC") application for an Order to Show Cause why Defendant Jamie L. Solow should not be held in contempt of court [DE 157], filed on June 4, 2009. I have reviewed the record and am advised

in the premises. I find Mr. Solow to be in Contempt of this Court's Order.

## I. Background

In this action, the SEC alleged that the Defendant, Jamie L. Solow ("Solow") engaged in a fraudulent trading scheme involving inverse floating rate collateralized mortgage obligation ("inverse floaters"). The case went to trial. The jury returned a verdict [DE 120] finding Mr. Solow liable on all seven counts of the Complaint. Accordingly, the May 14, 2008, 554 F.Supp.2d 1356, the Final Judgment [DE 138] explained that the jury found Mr. Solow violated: Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b) ] and Rule 10b–5 [17 C.F.R. § 240.10b–5]; Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a) ]. Additionally, the jury found that Mr. Solow aided and abetted primary violations by Archer Alexander Securities Corp. ("Archer Alexander") of: Section 17(a) of the Exchange Act [15 U.S.C. § 78q(a) ]; Rules 17a–3(a)(1) [17 C.F.R. § 240.17a–3(a)(1) ]; 17a–2(a)(2) [17 C.F.R. § 240.17a–3(a)(2) ]; 17a–3(a)(7) [17 C.F.R. § 240.17(a)(7) ]; 15(c)(3) of the Exchange Act [15 U.S.C. § 78o(c)(3) ]; Rule 15c3–1 [17 C.F.R. § 240.15c3–1]; Section 17(a) of the Exchange Act [15 U.S.C § 78q(a) ], and Rule 17a–4(a)(2) [17 C.F.R. § 240.17a–5(a)(2) ] thereunder.

The Final Judgment enjoined the defendant from any further statutory violations and from attempting to register as a broker-dealer or investment advisor or being associated with or seeking to be associated with a broker-dealer or an investment advisor. The Final Judgement also found Mr. Solow liable for $2,6446,485.99, together with prejudgment interest of $778,302.91, for a total of $3,424,788.90. Mr. Solow also had to pay a civil penalty of $2,646,485.99.

The SEC now moves the Court for an Order to Show Cause [DE 157]. The SEC states that although Mr. Solow responded to the Final Judgment by not paying the amounts ordered and claiming that he had "negative net worth," his depleted net worth was the result of a purposeful campaign of asset dissipation. The SEC explains that in the days preceding the jury trial, and the months before the entry of the Final Judgment, Mr. Solow and his wife liquidated joint securities accounts, and transferred the proceeds to an account in Mrs. Solow's name. Thereafter, Mrs. Solow traveled to Switzerland to deposit cash and jewelry in safe deposit accounts. In addition, after the jury's verdict, and less than 60 days prior to the entry of the Final Judgment, Mr. Solow executed a $5.26 million mortgage on his homestead property for the purpose of funding a Cook Islands asset protection trust in his wife's name. The SEC alleges that this enabled him to transfer $5.49 million of his individual net worth to his wife, in addition to the transfer of two real estate parcels whose combined value is over $3 million.

This Court held a hearing on August 14, 2009. Upon representations by the parties that the dispute could be resolved among them without this Court's hearing the merits of the claims, this Court ordered the surrender of Mr. Solow's passport [DE 166]. Thereafter, this Court issued an Order [DE 167] continuing the hearing, with the direction to Mr. Solow to provide the SEC counsel a full and complete accounting of the disposition of every asset that he owned or controlled through June 30, 2008, and that the parties make good faith efforts to reach a settlement in this matter.

The continued show cause hearing was delayed due to various scheduling issues outside of the Parties' control. In the interim, Mr. Solow has filed notices with this Court of its First Amended Account-

ing [DE 176–184], filed on November 19, 2009 through November 22, 2009. I have reviewed all of those filings. This Court issued an Order resetting the show cause hearing for January 8, 2010.

In the interim, the SEC filed suit against Mrs. Solow, a new party, Mr. Solow, and related entities for fraudulent transfer and foreclosure of equitable liens. *SEC v. Gina P. Solow, et al.,* CASE NO.: 09–CV–61868.[1] The complaint alleges, *inter alia,* many of the same alleged events and occurrences as those discussed in the instant application for an order to show cause in this case.

In the instant motion, the SEC further alleges that "Mr. Solow now claims to be wholly reliant on his wife to pay his 'recurring and non-recurring expenses,' such as the lease payments on his BMW automobile and extended visits to their Park City, Utah home in the winter months." [DE 157, ¶ 3]. Finally, it alleges that "Mr. Solow has made a mockery of his disgorgement obligation by paying only nominal amounts as he liquidates items such as office furniture and an old vehicle. Thus far, these payments have totaled a mere $2,639.24." [DE 157, ¶ 4]. Therefore, the SEC alleges that Mr. Solow is in contempt of Court for failure to comply with the Final Judgment. The SEC filed a memoranda in support of its motion [DE 157–2], with exhibits that include the Declaration of John G. Silbermann, counsel for the SEC, excerpts from the transcript of Mrs. Solow's deposition, and Mr. Solow's responses to post-judgment interrogatories.

The memorandum of law explains various events and financial transactions made by Mr. and Mrs. Solow against the backdrop of the trial and the final judgment.

From the SEC's brief, the docket, the SEC's January 13, 2010 filing, and the evidentiary hearing, I have organized such events into a condensed time-line as follows:

- November 9, 2007 — From this date until the commencement of the jury trial, Mr. and Mrs. Solow received deposits totaling $576,856.27 into their joint bank account at Bank of America ("BofA").

- November 13, 2007 — From this date until January 16, 2008, Mr. Solow paid his counsel $275,000 from the joint BofA account. The account was also used to pay the following expenses: $33,594.74 to Fettes College; $35,872.39 to American Express; $17,270.78 to Capital One; $27,737.12 to Lydian Bank; and $43,339.00 to Arbern for Jamie Solow's office rental.

- December 4, 2007 — Mr. Solow signed a bill of sale for a 2004 Rolls Royce Phantom for $205,000 as "Vice President and Duly Authorized Agent of JSolow Limo, Inc."

- January 2, 2008 — The Solows deposited a $46,856.27 cashiers check into their checking account.

- January 8, 2008 — Highland Financial Group, Inc. ("Highland") wired an additional $400,000 to the same account.

- January 22, 2008 — Civil trial commenced

- January 31, 2008 — Civil trial ended and jury returned verdict.

- February 4, 2008 — Mrs. Solow retains a law firm, Donlevy–Rosen & Rosen, P.A. ("Donlevy–Rosen Firm"), specializing in asset protection using offshore trusts in the Cook Islands.

- February 7, 2008 — First of three transactions ("Checking Account Transactions") in which a total of $820,000 was deposited in to their checking account from Highland and Arlene Zayas, the wife of Highland's principal officer.

- February 8, 2008 — The Commission filed, and served upon Solow's counsel, its motion for remedies, seeking

1. This case was originally assigned to Judge Cohn, and was subsequently transferred to Judge Middlebrooks pursuant to Internal Operating Procedure 2.15.00C of the United States District Court for the Southern District of Florida as a related matter to the above-captioned case.

judgment for penalties, disgorgement, and prejudgment interest totaling $6,214,632.46.

- February 11, 2008 — Mrs. Solow pays the Donlevy–Rosen Firm $30,000 in legal fees and $5,350 for a "cost deposit" out of the Solow's joint checking account.

- February 12, 2008 — $36,000 was transferred from the Solows' joint account at BofA into an account in the name of Gina P. Solow, and $27,727.12 was paid to Lydian Bank for the mortgage on the Hillsboro property.

- February 29, 2008 — The second of the three Checking Account Transactions described above.

Another series of transactions takes place. ("POD Account Transactions"). In these transactions, the Solows transfer $777,000 from their joint checking account to a checking account titled in the name of "Gina Pearl Solow POD Jamie Leigh Solow" (the "POD Account")[2].

- March 5, 2008 — The Solows paid $556,632 to the Internal Revenue Service.

- March 7, 2008 — The third of the three Checking Account Transactions described above.

By a corporate consent ("Corporate Consent") backdated to be effective March 3, 2008, Mrs. Solow authorizes a series of transaction that result in a $1,187,500 mortgage being placed on their Ft. Lauderdale residence in exchange for a certificate of deposit in the same amount to be assigned to the Gina P. Solow Trust, a Cook Islands International Trust. Mrs. Solow paid Donlevy–Rosen Firm $123,242.04 for a "Recording/Documentary Stamp."

- March 10, 2008 — Second of the "POD Account Transactions"

- March 24, 2008 — Mrs. Solow executes a mortgage on their Ft. Lauderdale residence in the amount of $1,187,500. Mr. and Mrs. Solow execute a mortgage on their Hillsborow Beach residence in the amount of $5,261,289. The lender for these two mortgages is the Federation Advances

Corp., a Nevis limited liability company identified in the Cook Islands Trust scheme.

- April 8, 2008 — Third of the "POD Account Transactions"

- April 9, 2008 — The Court holds an evidentiary hearing on remedies to be imposed against Mr. Solow. [DE 134].

- April 18, 2008 — Ms. Zayas transferred $279,256.10 to the POD account. Ms. Zayas also transferred $73,016.68 into the Solows' joint account at BofA. That same day, a check for $74,200 drawn on the Solows' joint account at BofA was written to Mr. Solow's attorney.

- April 21, 2008 — Mrs. Solow visits bankers in Zurich, Switzerland for the purpose of depositing cash and jewelry in safe deposit accounts.

- April 23, 2008 — Mrs. Solow transfers $50,000 from the POD account to an account in Mrs. Solow's name at Washington Mutual Bank.

- April 25, 2008 — Jamie Solow deposited a cashier's check in the amount of $9,900 payable to himself into the Solows' joint account at BofA.

- April 28, 2008 — Mrs. Solow transfers $20,000 from the POD account to an account in Mrs. Solow's name at Northern Trust Bank.

- May 7, 2008 — Mrs. Solow transfers $4,900 from the Solow's joint checking account to the POD account, leaving $20.00 in the joint checking account.

- May 20, 2008 — Mrs. Solow emails their accountant requesting he provide a statement to Mr. Solow's attorney that "due to [Mr. Solow's] high expenses, he has depleted his asset base and savings." The accountant declined to make that statement.

- May 14, 2008 — Final Judgment Issued

- September 10, 2008 — Mr. Solow made a partial payment of $335.00 toward the judgment from the sale of office furniture.

- December 3, 2008 — Mr. Solow made a partial payment of $2,142.04 toward the

2. The SEC believes that "POD" means "Pay on Demand," and is an authorization for a person other than an account owner to withdraw funds from the account. The POD account was opened by Mrs. Solow on October 31, 2007.

judgment from the sale of a 2001 Ford Expedition titled to Jamie Solow.

Mr. Solow made a third partial payment of $162.20 derived from a U.S. Treasury refund to JSolow Enterprises, Inc.

- August 14, 2009 First Show Cause Hearing
- December 23, 2009 Mr. Solow attempts to access his children's accounts and his IRA account.
- January 8, 2009 Evidentiary Show Cause Hearing

The SEC also alleges that though Mr. Solow states that he is responsible for a $750,000 line of credit extended on a parcel of real estate owned by Mrs. Solow, he did not disclose to the Court that the property was wholly owned by Mr. Solow prior to July, 2006, when he transferred his 100% ownership interest in that property to Mrs. Solow by quitclaim deed for no consideration.

## II. The SEC's Argument

The final Judgment decrees that Mr. Solow is "liable for disgorgement of $2,646,485.99 representing profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $778,302.91." [DE 138 at 5]. Mr. Solow was ordered to "satisfy this obligation by paying $3,242,788.90 within ten business days to the Clerk of this Court...." *Id.* The SEC alleges that Mr. Solow failed to do as ordered, and that he has only made three payments to the Clerk of the Court totaling $2,639.24. These payments are supported by the SEC's exhibits 37, 38, and 39 of the instant motion. [DE 157–7]. The SEC alleges that Mr. Solow has violated the terms of the judgment and "now has the burden of coming forward with evidence showing 'categorically and in detail' why he is unable to comply with the Court's order." [DE 157 at 11].

## III. Mr. Solow's Response

On June 22, 2009, Solow filed a response [DE 159] in opposition to the instant motion. It says that "any suggestion that Mr. Solow attempted to place assets that could have been used to satisfy the Final Judgment outside the reach of the SEC is inaccurate and misleading." [DE 159 at 3]. He argues that the assets the SEC seeks for satisfaction of the judgment are properties that were held as **tenancy by the entirety** by Mr. Solow and his wife. He argues that the SEC wrongly portrayed the post-verdict flurry of financial activity in such a way as to ask "the Court to draw the conclusion that ... Solow did have the ability to pay the Final Judgment ...," when all along, the property owned by the Solows was as tenants by the entirety, and was never reachable to satisfy the final judgment. [DE 159 at 4]. In sum, Mr. Solow contends that all the asset transfers are, essentially, a red herring, because even if the assets remained as they were, they were unreachable to satisfy the Final Judgment.

Mr. Solow further argues that because he lost his livelihood to this Court's Order barring him from doing business as either a broker-dealer or investment advisor, and because his assets were depleted defending against the SEC litigation, he truly lacks the assets to satisfy the judgment against him. I note, however, that according to a jury of his peers, Mr. Solow's "chosen profession" consisted of committing fraud against his investors through violations of federal law. That being the case, an opportunity to do different work, outside "his chosen field," may better serve his ability to satisfy the disgorgement order. Therefore, I will move on to consider the series of financial transactions subsequent to the jury verdict and before the entry of final judgment, in which jointly held assets were transferred into Mrs.

Solow's control only. I will address some, but not all, of Mr. Solow's property individually as follows.

## A. The Hillsboro Mile Property

Mr. Solow claims that he and his wife purchased the property at 1001 Hillsboro Mile in Hillsboro Beach, Florida (the "Hillsboro Mile Property") as tenants by the entirety in 2002, before any wrongdoing charged by the SEC in the present action. As stated above, the SEC claims that the Solows executed a mortgage on the Hillsboro Mile Property in the amount of $5,261,289, on March 24, 2008. Subsequently, in an affidavit [DE 148–2] filed with the Court on June 13, 2008, Mr. Solow represented that the property is secured by three loans: (1) a primary first mortgage in the approximate amount of $1.9 million; (2) an equity line of credit that has been fully utilized in the amount of approximately $500,000; and (3) a loan of approximately $5.2 million. Mr. Solow explains that the $5.2 million mortgage was an "in kind" transaction that did not result in any cash being conveyed to the Solows. Instead, all of the mortgage funds were invested in a certificate of deposit held by the trust in the Cook Islands (the Gina P. Solow Trust). He further states that the trust is irrevocable and "makes no provision for Mr. Solow to exercise any control over the property in that trust." [DE 159 at 7].

## B. The Ft. Lauderdale Condominium

The Solows reside in a condominium located at 4240 Galt Ocean Drive, Unit 504, Ft. Lauderdale, Florida, that was purchased in June 2003 by JSolow Condo One, Inc. ("JSolow One"), a corporation owned 100% by Mrs. Solow. As stated above, the SEC alleges that, on March 7, 2008, by a corporate consent backdated to be effective March 3, 2008, Mrs. Solow authorized a series of transactions resulting in a $1,187,500 mortgage being placed on their Ft. Lauderdale condominium in exchange for a certificate of deposit in the same amount to be assigned to the Gina P. Solow Trust in the Cook Islands. Mr. Solow claims that he has never had any legal ownership in the property, and therefore, the property was never available to the SEC to satisfy the Final Judgement.

## C. Securities Accounts and Joint Checking Account Transfers

As stated above, on February 7, February 29, and March 7, 2008, a total of $820,000 was deposited in the Solows' checking account from Highland Financial Group, Inc. ("Highland") and from Arlene Zayas, the wife of Highland's principal officer, James Riggio. In his response, Mr. Solow argues that these funds were "either those of Mrs. Solow alone or were owned by the Solows as tenants by the entirety so that, in either event, they were outside the reach of the SEC in seeking to satisfy the Final Judgement." [DE 159 at 8]. Mr. Solow then adds that those funds are presently not available to satisfy the Final Judgement because "they were used to pay tax liabilities owed by the Solows" in the amount of $556,632.00. [DE 159 at 8, n. 7].

The second series of transactions took place on February 29, March 10, and April 8, 2008, whereby the Solows transferred $777,000 from their joint checking account to a Bank of America checking account titled in Mrs. Solow's name. Mr. Solow claims that the funds in the joint checking account were held by them as tenants by the entirety, and therefore outside the reach of the Final Judgment.

## D. Mr. Solow's Tenancy by the Entirety Argument

Citing *United States v. Craft*, 535 U.S. 274, 122 S.Ct. 1414, 152 L.Ed.2d 437

(2002), Solow claims that while federal tax liens can encumber a taxpayer's interest in property held as tenants by the entirety, no other type of creditor is afforded such special treatment. Further, it is clear that in the bankruptcy context, property held as tenants by the entirety can not be divided to satisfy the debts of the debtor spouse. *See In re Sinnreich,* 391 F.3d 1295 (11th Cir.2004) (property owned by a Chapter 13 bankruptcy debtor as tenancy by the entireties with a non-debtor under Florida law was not part of the bankruptcy estate and therefore was exempt from bankruptcy administration). Therefore, Mr. Solow argues that only the IRS as a "super-creditor" may disrupt a tenancy by the entirety.

## IV. The SEC's Reply

The SEC states that Mr. Solow has not met his burden to show that he has an inability to pay. It relies on *In re Lawrence,* 279 F.3d 1294, 1300 (11th Cir.2002). In *In re Lawrence,* a Chapter 7 trustee sought to compel the turnover of an off-shore trust's assets that was created by the debtor. In creating the trust, the debtor had the sole power to appoint trustees. Accordingly, the Bankruptcy Court entered a turn-over order, and later held the debtor in civil contempt for violating the turnover order, and directing that he be incarcerated if he did not comply by a certain date. The district court affirmed both the turnover order and the civil contempt order. The debtor appealed.

The Eleventh Circuit upheld the district court's determination that, because the Trust specifically allows the settlor/debtor the right to appoint future trustees, he retained *de facto* control over the trust and could appoint trustees who could assign the entire proceeds to him. The Eleventh

Circuit court continued, "[e]ven if we were to find that [the settlor/debtor] had set forth sufficient evidence of impossibility, we must agree with the trial court that [the settlor/debtor's] claimed defense is invalid because the asserted impossibility was self-created. We previously have held that, 'where the person charged with contempt is responsible for the inability to comply, impossibility is not a defense to the contempt proceedings.' " *Id.* at 1300.

## V. Findings of Fact

After an evidentiary hearing held on January 8, 2009, and based on the evidence submitted to the Court, I make the following findings of fact:

1. Mr. Solow was and is aware that a Final Judgment ordering him to pay $3,424,788.90 in disgorgement and prejudgment interest (and a civil penalty of $2,646,485.99) was entered against him on May 14, 2008. (Tr. 22–24; SEC Hearing Exhibit 1).[3]

2. To date, Mr. Solow has paid a total of $2,639.24 towards the Final Judgment. (Tr. 26–27; SEC Hearing Exhibit 2).

*Source of Mrs. Solow's Funds*

3. From 2003 to 2006, Mr. Solow earned income of between $1,000,000 to $2,000,000 each year. (Tr. 41).

4. Mr. Solow's earnings throughout the years are the exclusive source of his wife's ("Mrs. Solow's") investments, savings and securities. (*See* Deposition Transcript of Gina P. Solow submitted in support of the SEC's Contempt Application as Exhibit B and, also as Exhibit B to Jamie L. Solow's Memorandum of Law in Opposition to the Contempt Application ("Gina Solow Depo."), p. 15; *see also* Tr. 143 (The Court: "So all of the money came from

---

**3.** References to the transcript of the hearing held on January 8, 2010 have been designated, "Tr.", followed by a reference to the appropriate page(s).

Mr. Solow?" Witness, Howard Rosen: "That was my understanding. Yeah."); Tr. 115 ("The source of income was from my [Mr. Solow's] earnings.")).

5. Mrs. Solow has not received any inheritance, nor did she bring any assets into her marriage to Mr. Solow. (Gina Solow Depo., pp. 15–16; *see also* Tr. 143 (The Court: "And did she bring anything into [the marriage] by way of inheritance or family moneys or any of that?" Witness, Howard Rosen: "Not that I recall.")).

6. Since she ceased working for AmeriFirst Bank in 1989, Mrs. Solow has not been gainfully employed. (Gina Solow Depo., pp. 11–12, 15).

7. Although Mr. Solow testified at the evidentiary hearing that his wife "is familiar with securities and bonds" (Tr. 47), when asked how securities would come to be titled in her name, at her deposition, Mrs. Solow replied, "I can't answer that. I have no idea." (Gina Solow Depo., p. 16). She further stated in her deposition that she did not trade the accounts herself, but relied on her husband to do so and that he had trading authority over accounts in her name. (Gina Solow Depo., p. 20),

8. Notwithstanding the fact that Mrs. Solow has brought no income or assets into the marriage, she now pays for all of Mr. Solow's living expenses. (Tr. 39; Gina Solow Depo. p. 19).

9. At the hearing, Mr. Solow testified that he had "no clue" as to the extent of the assets held by his wife. (Tr. 113–14). I find Mr. Solow's claim of complete lack of knowledge of his wife's financial dealings incredible.

*Receipt, Dissipation and Transfers of Assets Immediately Prior to the Jury Trial*

10. Mr. and Mrs. Solow maintained a joint bank account at Bank of America ("BofA"). (Tr. 44).[6]

11. Between November 9, 2007, and the commencement of the jury trial in this matter on January 22, 2008, Mr. and Mrs. Solow received deposits totaling $576,856.27 into their joint bank account at BofA. (Tr. 49, 55–57, 59; SEC Hearing Exhibit 3).

12. In addition, on December 4, 2007, Mr. Solow signed a bill of sale for a 2004 Rolls Royce Phantom for $205,000 as "Vice President and Duly Authorized Agent of JSolow Limo, Inc." (Tr. 52; SEC Hearing Exhibit 3).

13. Although Mr. Solow testified that Mrs. Solow purchased the Rolls Royce with "joint assets" (Tr. 53), Mr. Solow's accounting reflects that on March 24, 2004, $349,039.91 was withdrawn from an account held solely in his name at Pershing ("Jamie Solow Account Pershing QA3") and deposited into a jointly held account at Wachovia. Later that same day, $349,039.91 was transferred from the Solows' joint account at Wachovia to the Bank of America account of Lauderdale Imports for the purpose of purchasing the Rolls Royce. (Solow Hearing Exhibit 3 [DE 176], Jamie L. Solow's First Amended Accounting, Part One, Exhibit 2 at JSolow PJ 36).

14. With regard to JSolow Limo, Mrs. Solow testified at her deposition that she

---

**6.** There is no evidence before the Court that this joint bank account was held as tenants by the entireties. The Florida Supreme Court has noted that "many financial institutions do not provide married couples with the opportunity to declare their intent to establish a tenancy by the entireties," however, there is a presumption in favor of a tenancy by the entireties when a married couple jointly owns personal property. *Beal Bank, SSB v. Almand and Associates*, 780 So.2d 45, 56–7 (Fla.2001).

was the owner of the business, but that "[t]here was no purpose for that business. It was to put the cars in a corporate name." (Gina Solow Depo. pp. 8–9).

15. Similarly, Mrs. Solow owns JSolow Condo, Inc., a company whose sole purpose is to own the condo unit in which the Solows reside in Fort Lauderdale. (Gina Solow Depo., p. 8).

16. Between November 13, 2007, and January 16, 2008, Mr. Solow paid his counsel $275,000 (Tr. 48–50, 59; SEC Hearing Exhibit 3) from the joint BofA account. The account was also used to pay the following expenses: $33,594.74 to Fettes College; $35,872.39 to American Express; $17,270.78 to Capital One; $27,737.12 to Lydian Bank; and $43,339.00 to Arbern for Jamie Solow's office rental. (Tr. 62–63; SEC Hearing Exhibit 3).

*Receipt, Dissipation and Transfers of Assets Following the Jury's Verdict of Liability*

17. On January 31, 2008, the jury returned its verdict against Jamie Solow on all counts in the instant case. At the time the jury reached its verdict, Mr. Solow "assumed [he] would have some liability." (Tr. 68).

18. On February 7, 2008, a cashier's check from Highland Financial Group in the amount of $70,000 made payable to Jamie and Gina Solow was deposited into their joint account at BofA. (Tr. 63–64; SEC Hearing Exhibit 3).

19. On February 8, 2008, the Commission filed, and served upon Mr. Solow's counsel, its Motion for Remedies seeking a judgment for penalties, disgorgement and prejudgment interest totaling $6,214,632.46. (DE 121; DE 122).

20. On February 12, 2008, $36,000 was transferred from the Solows' joint account at BofA into an account in the name of Gina P. Solow (Tr. 64–65; SEC Hearing

Exhibit 3) and $27,727.12 was paid to Lydian Bank for the mortgage on the Hillsboro property. (*Id.*).

21. On February 29, 2008, Arlene Zayas of Highland Financial transferred $600,000 into the Solows' joint account at BofA. (Tr. 65–66; SEC Hearing Exhibit 3). That same day, $600,000 was transferred out of the Solows' joint account and into an account in the name of Gina P. Solow. (Tr. 66; SEC Hearing Exhibit 3).

22. On March 5, 2008, the Solows paid $556,632 to the Internal Revenue Service. (Tr. 66–67, 69; SEC Hearing Exhibit 3).

23. On March 7, 2008, Arlene Zayas of Highland Financial transferred $150,000 into the Solows' joint account at BofA. (Tr. 65–66; SEC Hearing Exhibit 3).

24. On March 10, 2008, $150,000 was transferred out of the Solows' joint account at BofA and deposited into an account in the name of Gina P. Solow. (Tr. 66; SEC Hearing Exhibit 3).

25. On April 9, 2008, the Court held an evidentiary hearing regarding the remedies sought by the SEC in this case. (DE 134).

26. On April 16, 2008, a check for $30,000 was deposited into the Solows' joint account at BofA (Tr. 75; SEC Hearing Exhibit 3) and on April 18, 2008, $27,549.05 from the Solows' joint account at BofA was used to pay Lydian Bank for the mortgage on the Hillsboro Beach property. (SEC Hearing Exhibit 3).

27. On April 18, 2008, Arlene Zayas of Highland Financial transferred $73,016.68 into the Solows' joint account at BofA. (Tr. 75; SEC Hearing Exhibit 3). That same day, a check for $74,200 drawn on the Solows' joint account at BofA was written to Mr. Solow's attorney.

28. On April 25, 2008, Jamie Solow deposited a cashier's check in the amount of

$9,900 payable to himself into the Solows' joint account at BofA. (Tr. 80; SEC Hearing Exhibit 3).

29. Based on the foregoing, the Court finds that after the jury's verdict finding Mr. Solow liable on all counts in the SEC's complaint, a total of $932,916.68 was deposited into the Solows' joint BofA account, and that these funds were either immediately dissipated or transferred into an account in Gina Solow's name alone.

*Receipt and Use of Highland Funds Paid to Gina Solow After the Jury Verdict*

30. In addition to the foregoing funds deposited into the Solows' joint account at BofA, on April 7 and April 18, 2008, Mrs. Solow received wire transfers into an account held solely in her name at BofA from Arlene Zayas at Highland Financial totaling $303,256.10. (Tr. 73–76; SEC Hearing Exhibit 3).

31. Mrs. Solow used $800 of these funds to pay Mr. Solow's attorney (Tr. 76; SEC Hearing Exhibit 3); $50,000 for a "trust" at Washington Mutual (Tr. 78–79; SEC Hearing Exhibit 3); and $20,000 was transferred to an account at Northern Trust (Tr. 80–81; SEC Hearing Exhibit 3).

*Retention of Asset Protection Attorneys Immediately Following Jury Verdict*

32. Four days after the jury returned its verdict on January 31, 2008, Mrs. Solow retained the law firm of Donlevy–Rosen & Rosen, P.A. (the "Donlevy–Rosen firm"), which specializes in asset protection. (DE 157–3, Composite Exh. 22 (to establish actual date of check of 2/4/08) and 31; Tr. 139, 141).

33. At the time Mrs. Solow met with the Donlevy–Rosen firm, she disclosed to them that her husband had just received an adverse jury verdict rendered against him. (Tr. 139–40).

34. By checks dated February 11, 2008 drawn on the Solows' joint account at BofA, Mrs. Solow paid her asset protection attorneys an additional $30,000 for "legal fee[s]" and $5,350 for a "cost deposit." (DE 157–3, Exh. 22 at Bates Nos. 273, 274; Exh. 23; Tr. 139).

35. On March 7, 2008, Mrs. Solow wrote a check for $123,242.04 to the law firm of Donlevy–Rosen, drawn on an account held in her name at BofA. (Tr. 68–69; SEC Hearing Exhibit 3). These funds were for costs associated with the formation of a Cook Islands trust. (Tr. 147).

36. According to one of Mrs. Solow's attorneys, Howard Rosen, the purpose of the trust was to protect Mrs. Solow's assets such that in the event Mrs. Solow should die, the assets would not pass to her husband and be taken by one of his judgment creditors. (Tr. 119).

37. Gina Solow is the settlor of the Cook Islands trust and the trustee is a corporation located in the Cook Islands, South Pac Trust International. (Tr. 121).

38. Mrs. Solow placed into the Cook Islands trust her jewelry because "she was not trusting of the legal system," the home she owned with Mr. Solow on Hillsboro Mile, and the condominium in which the Solows reside, which was held by a corporation. (Tr. 120).

39. Mrs. Solow did not place the Utah property into the trust because title to such property had been transferred to her within four (4) years, which is the state statute of limitations on fraudulent transfers. (Tr. 120; 163).

40. The method by which the Donlevy–Rosen firm sought to protect the real estate was that a mortgage was placed on the properties "in the event something would happen to [Mrs. Solow] and the property did pass to her husband, that there would be no equity for a judgment creditor of his." (Tr. 120).

41. The offshore trustee finds an offshore lender willing to make the mortgage loan. (Tr. 162).

42. Mrs. Solow could not have encumbered the Hillsboro Mile property without Mr. Solow's consent. (Tr. 130).

43. On March 24, 2008, Mr. Solow voluntarily signed a mortgage valued at $5.2 million to encumber the Solows' jointly-owned property on Hillsboro Mile. (Tr. 28; SEC Hearing Exhibit 4).

44. A certificate of deposit ("CD") was issued representing the $5.2 million proceeds from the mortgage, which CD is now an asset of Mrs. Solow's Cook Islands trust. (Tr. 154).

45. The interest earned on the CD is used to pay the interest on the mortgage loan on a quarterly basis. (Tr. 154–55).

46. The only method by which assets could be paid out from the trust would be at the request of one of the beneficiaries. (Tr. 178).

47. On or about April 21, 2008, (and after the remedies hearing in this matter on April 9, 2008), Mrs. Solow traveled to Zurich, Switzerland to place her jewelry in a vault there, held in the name of the trust. (Tr. 123; SEC Hearing Exhibit 3).

48. Although Mr. Rosen testified that he did not believe that the transfer of the jewelry into the trust in 2008 was done with the intent to hinder, delay or defraud a creditor of Mrs. Solow's because she did not have any creditors at the time (Tr. 124), he was aware that property in Utah had been transferred to her within the four year state statute of limitations for fraudulent transfers. (Tr. 120).

*Mr. Solow Created His Inability to Pay the Final Judgment*

49. Mr. Solow has not worked in the last four (4) years (Tr. 31), although he intends to get a job "at some point." (Tr. 114).

50. Mr. Solow testified that he asked Mrs. Solow to sell the Hillsboro Mile house and give up equity in that property to pay towards the Final Judgment. (Tr. 27–29). However, the Court was not presented with any evidence that the Solows have attempted to unwind the trust or the mortgage on that property, and Mrs. Solow's attorney testified that Mrs. Solow does not have the ability to force the trustee to engage in any action. (Tr. 122).

51. Mr. Solow testified that he asked his wife to sell the Utah property. (Tr. 29). She has refused. (Tr. 29).

52. Mr. Solow has not asked his wife about the liquidation of the condo in Ft. Lauderdale. (Tr. 30).

53. Notwithstanding Mr. Solow's testimony that "I don't live extravagantly myself" (Tr. 31), since the entry of the Final Judgment in this matter, Mr. Solow has enjoyed and continues to enjoy an extravagant life style that includes the use of a winter home in Utah (Tr. 37), ocean front real estate in Hillsboro Beach, Florida (Tr. 27–28; 37–38), a luxury condominium in Ft. Lauderdale, Florida (Tr. 35), and, up until last year, a BMW automobile (Tr. pp. 35–36).

54. Based on the record and the evidence in this case, that Mr. Solow rendered himself unable to pay the Final Judgment by shifting assets to his wife and by abdicating all financial responsibility to her. (*See, e.g.,* Tr. 68 ("I let [my wife] handle all of the finances."); Tr. 71 ("I wasn't sure of where or how much she was spending."); Tr. 113–14 (as to the extent of the assets held by Mrs. Solow, testifying, "I have no clue")).

55. Although Mr. Solow contends that he has made in good faith all reasonable efforts to pay the Final Judgment, this

contention is not credible. Consequently, Mr. Solow's inability to pay the Final Judgment is self-created.

Subsequent to the hearing, the SEC submitted a Notice of Filing Additional Evidence [DE 192]. In this filing, the SEC alleges that, on December 23, 2009, in an email sent from an email address maintained by Gina Solow, but signed by Jamie Solow, Mr. Solow sought to "unfreeze" three accounts held by his children, Alexandra, Spencer, and Samantha, which were created under the Uniform Transfer to Minors Act ("UTMA"), and his individual retirement account ("IRA"), which Mr. Solow asserted was "exempt from any of Jamie Solow's creditors." The SEC attached an email written by Mr. Solow to Mr. Davis of Penson Financial Services, Inc. ("Penson"), requesting he release holdings on his IRA account. The email also stated that his children had all reached the age of majority, and requested that those accounts be transferred "to the individuals [sic] name and unfreeze the accounts." [DE 192–2].

According to the spreadsheet provided by Penson, the IRA held in Mr. Solow's name has a cash position of $2,802.43 and positions in collateralized mortgage obligations ("CMOs") valued at $51,366.09.[7] The Penson spreadsheet was also attached to the filing.

At the evidentiary hearing held on January 8, 2010, Mr. Solow testified:

> [W]hat I have, what I own I'm offering entirely to the Court. (Tr. 33) (emphasis added). I've offered you the equity in the only asset that I own . . . (Tr. 34)

(emphasis added). I don't have a dollar to my name. (Tr. 34).

Mr. Solow did not mention his IRA at Penson nor his efforts to liquidate it a mere sixteen (16) days prior to his appearance before this Court. This significant omission from his testimony indicates that the purpose of his inquiry upon Penson was not for the benefit of satisfying the Final Judgment Order of Disgorgement.

## VI. Conclusions of Law

The Final Judgment in this case includes an order requiring Mr. Solow to pay disgorgement and prejudgment interest of $3,424,788.90. "Disgorgement orders operate to 'wrest[ ]ill-gotten gains from the hands of a wrongdoer . . . A disgorgement order is more like an injunction for the public interest than a money judgment . . . It is this feature, the similarity to an injunction, that allows disgorgement orders, unlike judgments, to be enforced by civil contempt.'" *Steffen v. Gray, Harris & Robinson, P.A.,* 283 F.Supp.2d 1272, 1282 (M.D.Fla.2003) (internal citations omitted).

### A. Standards for Civil Contempt

 Courts have inherent power to enforce compliance with their lawful orders through civil contempt. *Shillitani v. U.S.,* 384 U.S. 364, 370, 86 S.Ct. 1531, 1532, 16 L.Ed.2d 622 (1966). Civil contempt is remedial; the penalty serves to enforce compliance with a Court order or to compensate an injured party. *In re Stewart,* 571 F.2d 958, 963 (5th Cir.1978), *cited by In re Rumaker,* 646 F.2d 870, 871 (5th Cir.1980). In a civil contempt proceeding, the petitioning party bears the burden of

---

**7.** The SEC alleges that, according to information provided by Penson, the pricing for CMOs is based upon the sale of the securities in "round" lots of 100 which are worth more than smaller "odd" lots. The liquidation of odd lots (like those held in Mr. Solow's IRA account) would be difficult and likely not yield the valuation on the attached spreadsheet. Should the lots held in Mr. Solow's IRA account be combined with the lots in the accounts of his children, the pricing for those aggregate positions would be better and make the securities more saleable.

establishing by "clear and convincing" proof that the underlying order was violated. *Newman v. Graddick,* 740 F.2d 1513, 1525 (11th Cir.1984); *Piambino v. Bestline Products, Inc.,* 645 F.Supp. 1210, 1213 (S.D.Fla.1986). However, once the moving party makes a prima facie showing that the court order was violated, the burden of production shifts to the alleged contemnor to show a "present inability to comply that goes 'beyond a mere assertion of inability....'" *Combs v. Ryan's Coal Co., Inc.,* 785 F.2d 970, 984 (1986) (quoting *United States v. Hayes,* 722 F.2d 723, 725 (11th Cir.1984)); *see also United States v. McAnlis,* 721 F.2d 334, 337 (11th Cir.1983), *cert. denied,* 467 U.S. 1227, 104 S.Ct. 2681, 81 L.Ed.2d 877 (1984).

■ Therefore, the focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue. *Jim Walter Resources, Inc. v. Int'l Union, United Mine Workers of America,* 609 F.2d 165, 168 (5th Cir.1980). Conduct that evinces substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance. *Newman,* 740 F.2d at 1524. *See also Howard Johnson Co., Inc. v. Khimani,* 892 F.2d 1512, 1516 (11th Cir.1990). Therefore, under the Eleventh Circuit's case law, the alleged contemnor may avoid a contempt finding by showing an inability to comply or a good faith effort to comply. *Khimani,* 892 F.2d at 1516, *see also United Student Aid Funds, Inc. v. Gary's Grading & Landscaping,* 2009 WL 161711 (M.D.Fla.2009). While inability to pay is a defense to civil contempt, inability to pay is not a defense if the contemnor created the inability. *See e.g., Hodgson v. Hotard,* 436 F.2d 1110, 1116 (5th Cir.1971); *Piambino v. Bestline Products, Inc.,* 645 F.Supp. 1210, 1215 (S.D.Fla.1986).

**B. Through the Remedy of Disgorgement, This Court's Equitable Powers Allow it to Reach Assets Otherwise Protected by State Law.**

■ Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws. *S.E.C. v. Gane,* 2005 WL 90154 at *19 (S.D.Fla. 2005) (*citing SEC v. First City Financial Corp. Ltd.,* 890 F.2d 1215, 1230 (D.C.Cir. 1989)). A disgorgement order is more like an injunction for the public interest than a money judgment. *See SEC v. Huffman,* 996 F.2d 800, 802–03 (5th Cir.1993), *see also Steffen,* 283 F.Supp.2d 1272, 1282 (M.D.Fla.2003). Disgorgement is not precisely restitution; it wrests ill-gotten gains from the hands of a wrongdoer. *Huffman,* 996 F.2d at 802. It is this feature, the similarity to an injunction, that allows disgorgement orders, unlike judgments, to be enforced by civil contempt. *Huffman,* 996 F.2d at 802–03.

This Court has broad equitable powers to reach assets otherwise protected by state law to satisfy a disgorgement. *See S.E.C. v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1103 (2d Cir.1972) ("Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy"). For example, a district court can ignore state law exemptions as well as other state law limitations on the ability to collect a judgment in fashioning a disgorgement order. *See Huffman,* 996 F.2d at 803 (holding that disgorgement is not a "debt" under the Federal Debt Collection Procedures Act, and defendants could not avail themselves of the state law

exemption under the Act); *SEC v. AMX, Int'l, Inc.*, 872 F.Supp. 1541, 1544–45 (N.D.Tex.1994) (homestead exemption not taken into account); *SEC v. Musella*, 818 F.Supp. 600 (S.D.N.Y.1993) (holding exemptions from attachment under New York law did not alter a person's duty to pay under a disgorgement order); *see also Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 711 F.2d 1085, 1093 (1st Cir. 1983) (ignoring state law limitations on alter ego theory in ERISA context).

Finally, in *SEC v. Hickey*, 322 F.3d 1123 (9th Cir.2003), the court held that the district court's broad equitable powers to reach third parties to effect orders in securities fraud enforcement actions allowed it to freeze a corporation's assets, even when there was no alter ego relationship under California law. The *Hickey* court stated the following;

> We do not think that state law limitations on the alter ego theory or doctrine are necessarily controlling in determining the permitted scope of remedial orders under federal regulatory statutes. Instead, federal courts have inherent equitable authority to issue a variety of ancillary relief measures in actions brought by the SEC to enforce the federal securities laws.
>
> *SEC v. Hickey*, 322 F.3d at 1131 (internal citations and quotations omitted).

The *Hickey* court stated that "[t]he necessity of the district court's asset freeze is demonstrated by the total and complete control that Hickey exercised over the Brokerage, and by the fact that Hickey's only source of income was the money that he ordered paid to himself through the Brokerage from the assets frozen by the court's order." *Id.* Similarly, in this case, Mr. Solow's only source of income and support is what he receives from his wife, who is "supporting her children, her husband and herself" with the transferred assets because she is "a 'full-time mother' who has not been employed outside the home since [the children's] birth." [DE 159 at 6]. Therefore, this ability to ignore state law limitations and exemptions exists so that state law cannot defeat or limit the scope of remedial orders under federal law. *See Hickey*, 322 F.3d at 1131; *Steffen*, 283 F.Supp.2d at 1282.

### C. Mr. Solow Was Ordered To Pay disgorgement and His Failure to Pay Constitutes Contempt.

 Mr. Solow's failure to satisfy his obligations under the Final Judgment warrants this Court holding him in civil contempt. A defendant is in civil contempt when: (1) it is shown by "clear and convincing evidence that the alleged contemnor has violated an outstanding court order;" and, (2) the defendant fails to show that "he has made 'in good faith all reasonable efforts' to meet the terms of the court order he is seeking to avoid." *Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir.1992). The facts and record before this Court support a finding of civil contempt against Mr. Solow.

#### 1. The final Judgment Ordered Mr. Solow to Pay Disgorgement and Prejudgment Interest Totaling $3,424,788.90 by May 28, 2008, and Mr. Solow's Failure to Make This Payment Constitutes Contempt.

The Final Judgment orders, adjudges and decrees that Mr. Solow "is liable for disgorgement of $2,646,485.99 representing profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $778,302.91." [DE 138 at 5]. Mr. Solow was further ordered to "satisfy this obligation by paying $3,424,788.90 within ten business days to the Clerk of this Court...." *Id.*

Mr. Solow failed to pay "$3,424,788.90 within ten business days to the Clerk of this Court" as ordered. Since the entry of the Final Judgment, Mr. Solow has made only three payments totaling $2,639.24. (SEC Hearing Exhibit 2).

It is undisputed that Mr. Solow has violated the terms of the Judgment by failing to make full and prompt payment as ordered. Accordingly, Mr. Solow bears the burden of coming forward with evidence showing "categorically and in detail" why he has been unable to comply with the Court's order. In asserting that he is unable to comply with the order, Mr. Solow was required to "show that 'he has made in good faith all reasonable efforts'" to comply. *Wellington,* 950 F.2d at 1529. Mr. Solow has not satisfied this burden because, to the extent that he has been unable to comply, such inability was self-created and therefore, an impossibility defense is unavailable to him. *In re Lawrence,* 279 F.3d 1294, 1300 (11th Cir.2002).

**2. Mr. Solow Has Not Established That He Made "In Good Faith All Reasonable Efforts" to Meet the Terms of the Final Judgment.**

**a) Where Impossibility of Compliance is Self–Created, the Defense Impossibility is Unavailable to the Defendant.**

The case at bar is similar to the reported cases of *In re Lawrence,* 279 F.3d 1294 (11th Cir.2002) and *SEC v. Bilzerian,* 112 F.Supp.2d 12 (D.D.C.2000). In *Bilzerian,* the SEC applied for a show cause order seeking to hold Mr. Bilzerian in civil contempt for failure to pay the disgorgement order entered against him. The district court entered the show cause order, set a hearing date, and "ordered Bilzerian to file a sworn accounting identifying all assets in which he had any direct or beneficial interest." *Bilzerian,* 112 F.Supp.2d at 15.

"Bilzerian claim[ed] to have no assets with which to pay the disgorgement judgment and therefore defend[ed] against a finding of contempt on the ground that he [was] unable to comply with the court's orders." *Id.* at 17. Specifically, "Bilzerian maintain[ed] that he [had] no meaningful assets with which to pay the judgment, claiming that all of his assets were lost, disgorged, or transferred long ago." *Id.* at 17–18. Bilzerian's assets were transferred to his wife, a web of corporations, and, inter alia, a Cook Islands trust. *Id.* at 25; *see also, Steffen,* 283 F.Supp.2d at 1276–77.

"The SEC's primary argument [was] that Bilzerian [had] attempted to hide his ability to comply with the Court's orders by transferring assets he held directly into off-shore trusts and other entities in which he maintain[ed] an indirect beneficial interest." *Bilzerian,* 112 F.Supp.2d at 24. The district court found Bilzerian's financial disclosure to be misleading due to its failure to include Bilzerian's "indirect beneficial interests." *Id.* The court held that it "may consider all potential sources of funds available to Bilzerian, including jointly-owned assets." *Id.* at 25 ("a one-half interest in Bilzerian's and his wife's jointly-held assets could be a very substantial financial resource.")

The court further noted that "[w]here assets are held in an offshore trust, the 'burden of proving impossibility as a defense to a contempt charge will be especially high.'" *Bilzerian,* 112 F.Supp.2d at 26 (citing, *Affordable Media,* 179 F.3d at 1241 (9th Cir.1999)). "The Court may consider Bilzerian's beneficial interest in the [Cook Islands] Trust in determining his ability to comply no matter what the origin of the trust's assets. Moreover, as noted above, the Court is not limited to considering only Bilzerian's individually owned assets in determining his ability to comply." *Id.*

The *Bilzerian* court also held that the defendant "failed to demonstrate that he [had] made in good faith all reasonable efforts to comply with the Court's disgorgement orders." *Bilzerian,* 112 F.Supp.2d at 26 (noting that a "party seeking to avoid a finding of contempt must demonstrate that 'all reasonable avenues for raising funds have been explored and exhausted.'") The Court noted that Bilzerian's efforts were devoted not to showing the court that he was diligent in complying, but rather "his diligent efforts [had] been focused on how to avoid compliance with the Court's orders." *Id.; see also, Yun,* 208 F.Supp.2d at 1286 ("[a]lthough Yun has made no attempt to pay the judgment ... she has gone to great lengths to avoid doing so, taking deliberate steps to deplete her assets since the entry of this Court's final judgment.")

Finally, the *Bilzerian* court held that even if the defendant could not reclaim control over the assets he transferred away, Bilzerian would still be held in contempt because an inability defense is unavailable where the inability was created by the defendant himself. *Bilzerian,* 112 F.Supp.2d at 28 (noting further that if the defendant cannot convince the transferees "to return his assets to him, it is a problem of his own making.") (Citing *Piambino v. Bestline Products, Inc.,* 645 F.Supp. 1210, 1215 (S.D.Fla.1986)).

Subsequently, Bilzerian's wife, Steffen, filed for bankruptcy. After that, with her husband in jail for contempt[8] and her assets frozen, she settled with the SEC to obtain Bilzerian's release from prison and the release of her frozen assets.

Mr. Lawrence, Mr. Bilzerian and Mr. Solow each divested control over their assets through the use of offshore "asset protection" trusts and then represented to their trial judges that it was impossible for them to make their court-ordered payments. *In re Lawrence,* 279 F.3d at 1296–97; *Bilzerian,* 112 F.Supp.2d at 17–23; [DE 148]. Like the defendant in *Lawrence,* Mr. Solow divested himself of his assets in anticipation of the judgment that was about to be entered against him. Moreover, this Court finds that Mr. Solow has not made good faith reasonable efforts to retrieve those assets.

Following the *Lawrence* precedent, this Court holds that Mr. Solow is in contempt of the Court's Final Judgment. Mr. Solow may purge his contempt by making good faith reasonable efforts to retrieve his assets and apply them toward the Final Judgment.

Significantly, in *Lawrence,* the Eleventh Circuit noted, " '[w]hile it is possible that a rational person would send millions of dollars overseas and retain absolutely no control over the assets, we share the district court's skepticism.' " *Lawrence,* 279 F.3d at 1298 (internal citation omitted.) I am also skeptical of Mr. Solow's financial maneuvers.

Further, in *S.E.C. v. Yun,* 208 F.Supp.2d 1279, 1284 (M.D.Fla.2002), Defendant Yun was found liable for fraudulent insider trading. The court issued a final judgment requiring, *inter alia,* disgorgement of $269,000. Yun sought a stay pending appeal, but challenged having to post a supresedeas bond. The *Yun* court disregarded state law asset protections, but given the circumstances of the case, chose to honor the protection of a family home owned by the husband of the defendant as a tenancy by the entirety. Importantly, the *Yun* court stated:

---

**8.** *See SEC v. Bilzerian,* 131 F.Supp.2d 10, 18 (D.D.C.2001), *affirmed, SEC v. Bilzerian,* 75 Fed.Appx. 3 (D.C.Cir.2003).

... Yun owns three separate annuity contracts ... [and][a]lthough these annuities are immune from process under Florida law ... this is not a Florida state court, and, as such, it is not bound by Florida law. Although a district court may choose to be guided by state statutes exempting certain property from judgment collection efforts, the district court has broad discretion in fashioning the equitable remedy of a disgorgement order ... *This Court, in its discretion, will not be guided by state law where its effect is to make a liable party judgment proof.* Therefore, this Court finds that Yun must rely on her annuity contracts should that be necessary to post a full supersedeas bond. *Yun*, 208 F.Supp.2d at 1283–84 (internal citations and quotations omitted, emphasis added).

This Court does not have to recognize the protections of tenancy by the entirety created by State law. The *Yun* court articulates sound reasoning for declining to force the defendant to disgorge her home. In this case, however, such reasoning is not as persuasive given the context. First, unlike Yun, by his own account, Mr. Solow does not have any other assets he can use to satisfy the disgorgement judgment. Second, unlike a single marital home, the property claimed to be previously owned as tenants by the entirety includes both real property and securities and checking accounts. Third, those various properties claimed to be held as tenants by the entirety are funded entirely by Mr. Solow. These factors, not present in the *Yun* case, outweigh the reasoning articulated in *Yun* for recognizing one state law exemption and not others.

This Court, in its equitable powers, could have reached Mr. Solow's assets that were held jointly, or by tenancy by the entirety, prior to their transfer to his wife.

Therefore, Mr. Solow's argument that such assets were *never* available to satisfy the disgorgement is unavailing. As such, the situation is what it appears: Mr. Solow transferred assets to his wife after the verdict and before the disgorgement order in order to avoid the forthcoming disgorgement order.

In response to his claim that his case was distinguishable from other impossibility cases because Mr. Solow transferred his assets before the judgment was entered against him, the *Lawrence* court held that "[t]his contention clearly lacks merit ... Lawrence created this Trust in an obvious attempt to shelter his funds from an expected adverse arbitration award." *Id.*

b) **Mr. Solow's Claimed Inability to Comply With the Terms of the Final Judgment Was Self–Created and Therefore the Defense of Impossibility is Unavailable to Mr. Solow**

"Even if we were to find that [the debtor] had set forth sufficient evidence of impossibility, we must agree with the trial court that [the debtor's] claimed defense is invalid because the asserted impossibility was self-created. We previously have held that, 'where the person charged with contempt is responsible for the inability to comply, the impossibility is not a defense to the contempt proceedings.'" *In re Lawrence*, 279 F.3d at 1300. In this case, even if Mr. Solow is presently unable to comply with this Court's Order of disgorgement, such a situation is one that he created. The Florida Supreme Court has held that one spouse may not alienate a portion of the tenancy by the entireties without the consent of the other. *Beal Bank, SSB*, 780 So.2d at 56. Therefore, in order to effect these transfers of assets from Mr. and Mrs. Solow's accounts held as tenancy by the entirety or real property held as tenancy by the entirety, Mr. Solow would have to consent. Such self-created

penury does not exempt Mr. Solow from being held in contempt by this Court. *See In re Lawrence; see also In re Power Recovery Systems, Inc.,* 950 F.2d 798, 803 (1st Cir.1991) (a party may defend contempt and failure to comply on the grounds that compliance was impossible; self-induced inability, however, does not meet the test).

■ This Court finds that Mr. Solow was diligent in his efforts to divest himself of assets that would otherwise have been available to satisfy the Court's disgorgement order. His professed inability to pay the amounts ordered by the Court is disingenuous at best. As in the *Yun, Bilzerian* and *Lawrence* cases, the Court holds that Mr. Solow's inability defense is unavailing because such inability was self-created.

Between January and April, 2008, Mr. Solow and his wife liquidated securities accounts totaling $1,546,112. Some of these funds were paid to Mr. Solow's litigation counsel and some of the funds were paid to Mrs. Solow's asset protection attorneys. More than three-quarters of these jointly held assets, $1,161,156, were transferred to an account owned by Mrs. Solow only.

The largest depletion of Mr. Solow's estate by far was the $5.2 million mortgage on the Hillsboro Beach Property he executed on March 24, 2008. The proceeds of this loan were used to fund a CD now held by a Cook Islands trust for the benefit of Mrs. Solow. Moreover, even though Mr. Solow received none of the benefit of this $5.2 million mortgage, he claims it as a liability contributing to his "very substantial negative net worth." [DE 148, at 1; DE 148–2, at 4].

Notwithstanding these voluntary transfers from Mr. Solow to his wife, Mr. Solow now claims to be a ward of his wife. This contention was made even though the Solows' accumulated wealth has been derived exclusively from income earned by Mr. Solow. If Mr. Solow cannot convince his spouse to return his assets to him, that is a problem of his own making and he is consequently in contempt of court.

Although Mr. Solow contends that he has nothing with which to pay the Final Judgment, this "mere assertion of *'present inability'* is insufficient to avoid a civil contempt finding." *In re Lawrence,* 251 B.R. 630, 652 (S.D.Fla.2000) (emphasis added). *See also, SEC v. Musella,* 818 F.Supp. 600, 602 (S.D.N.Y.1993) ("a mere showing that the party was unable to pay the entire amount ... is insufficient to avoid a finding of contempt.... [T]he party must pay what he or she can.") (*Citing, Piambino v. Bestline Products, Inc.,* 645 F.Supp. 1210, 1214 (S.D.Fla.1986)). The Court finds that Mr. Solow's contentions do not establish an inability to pay defense.

The Court holds that the March 24, 2008 mortgage executed by Mr. Solow irrefutably establishes that: (1) Mr. Solow has not made good faith efforts to pay the amounts ordered; and (2) his professed inability to use the Hillsboro Beach Property to obtain funds to pay disgorgement was self-imposed. In executing this mortgage, Mr. Solow demonstrated quite clearly that he had the ability to extract $5.2 million from his Hillsboro Beach property. The fact that he did so to fund a Cook Islands Trust for the benefit of his wife only adds to the egregiousness of his conduct. His duty to the Court is to make good faith efforts to pay as much of the judgment as possible, not to obfuscate his burden in these proceedings by arguing the non-issue of tenancy by the entireties. *See Bilzerian,* 112 F.Supp.2d at 26 ("the Court is not limited to considering only [defendant's] individually owned assets in determining his ability to comply").

Mr. Solow would like the Court to believe that his best efforts to pay the disgorgement obligation ended with the liquidation of an old truck, a desk set and a small income tax refund totaling $2,639.24. Mr. Solow lives in a beachfront condominium in Fort Lauderdale; owns a beachfront house on Hillsboro Mile; spends extended winter vacations at his family home in Park City, Utah; and enjoys the representation of sophisticated defense counsel in these proceedings. According to Mr. Solow, all of these expenses are paid through the largesse of his wife. However, the record shows that this largesse is derived entirely from assets acquired with Mr. Solow's earnings. The Court finds that Mr. Solow has purposefully sought to insulate these assets from the Court's reach.

■■■ Mr. Solow relies heavily on the Eleventh Circuit case, *McGregor v. Chierico*, 206 F.3d 1378 (11th Cir.2000), and as this case address tenancies by the entirety, it warrants further discussion. Under Florida law, property held by tenancy by the entirety is exempt from process to satisfy the individual obligations of either spouse, but may be reached only by a joint creditor of both spouses. *In re Droumtsekas*, 269 B.R. 463 (Bkrtcy.M.D.Fla.2000) Citing *Chierico*, Mr. Solow argues that a district court cannot force the severance of a tenancy by the entirety for the purpose of taking property owned by the guilty spouse. He concludes that because he cannot use such property to satisfy the disgorgement order, and the SEC does not allege he has other assets, he has shown as a matter of law that he is unable to comply.

In *Chierico*, the Eleventh Circuit held that a homestead held by a tenancy in the entirety could not be reached in a contempt proceeding because the wife was a completely innocent party to the alleged action that constituted contempt. *Chieri-*

co, 206 F.3d at 1385–86. In that case, a district court had held Mr. and Mrs. McGregor in contempt for violating an injunction against telemarketing, and entered a judgment finding they had caused actual damage in the amount of $7.2 million. It ordered them to forfeit most of their assets, including their homestead. The Eleventh Circuit reversed the order of contempt against the wife because she was not a part of her husband's business, and "the FTC included [her] in these contempt proceedings ... because, as [the] wife, she received some money from her husband's businesses." *Id.* at 1383–3. It also reversed the forfeiture order because of her rights in the homestead:

> This court has already determined that severance of a tenancy by the entirety for the purpose of taking the property owned by a guilty spouse, works a partial taking of the innocent spouse's property. The partial taking results from the fact that a tenant by the entirety holds an indivisible right to own and occupy the entire property. To convert that right to own and occupy into a tenancy in common would effect an unlawful taking.
> * * *
> As tenants by the entireties, this court cannot extract [the husband's] rights in the family home without affecting [the wife's] rights. Because the district court erred in holding [the wife] in contempt, it would be unjust to force her to relinquish any innocently held property rights. Thus, in effect, protection of [the wife's] interest in the family home renders [the husband's] interest in the home unreachable by the court's contempt power.

*Chierico*, 206 F.3d at 1385–6 (internal citations and quotations omitted).

As pointed out by Judge Moody in *Steffen v. Gray, Harris & Robinson, P.A.*, the

*Chierico* opinion involved a final judgment, not a disgorgement order, and "[e]nforcement of a disgorgement order against property (real or personal) has been treated differently by courts from enforcement of a judgment." 283 F.Supp.2d 1272, 1283 (M.D.Fla.2003). The *Steffen* court also stated that, unlike *Chierico*, in the *Steffen* litigation, there was evidence that (1) the defendant husband maintained control of, or had an interest in, the off-shore trust in his wife's name; (2) the husband transferred his interest in his assets to avoid creditors like the SEC; and (3) the husband was involved in the transfers. Similarly, this case is more akin to the litigation in *Steffen* than *Chierico*: (1) Mr. Solow certainly has a *de facto* interest in the trust as it constitutes his whole source of support; (2) he transferred his interest in his assets on the eve of judgment to avoid the SEC as a creditor; (3) and he was involved in the transfers. Furthermore, the real property was just one part of all of the assets transferred from Mr. Solow to his wife.

Although Mr. Solow seeks to rely on the *Chierico* case, that case stands for the broader proposition that "a court cannot use its contempt power to acquire assets owned by innocent individuals." *Chierico*, 206 F.3d at 1385. *Chierico* applied that holding to "determine what effect [Mrs.] Chierico's innocence will have upon the validity of the district court's order that the Chiericos forfeit jointly held property, in particular, their family home." *Id.* This Court holds that the *Chierico* opinion is not applicable to this case because the Court has not subjected Mrs. Solow to any of its orders. Rather, this Court ordered Mr. Solow to act and is now holding only Mr. Solow in contempt for his failure to comply with such order.

In addition, the Eleventh Circuit in *Chierico* expressed concern over forcing the wife to relinquish the family home. This case is distinguished in that there is no one "family home" to be protected. In fact, the wife in this case lives in a luxury condominium in Ft. Lauderdale owned by a company in which she has a 100% interest, and she also owns a residence in Park City, Utah. Furthermore, in *Chierico*, the parties entered into a stipulated final judgment. In contrast, in this case Mr. Solow was found liable by a jury, and subsequently, a fanfare of asset protection activities took place **after** the jury verdict and before the judgment. Jewels were taken to Switzerland, and the equity was stripped from the tenancy by the entirety to be placed in trust in the Cook Islands. Put simply, the Eleventh Circuit does not find or mention any instances of bad faith subsequent to the assignment of liability in *Chierico* or a campaign of asset dissipation, but instead, expressed concern about taking the family home from a person it deemed an "innocent" spouse, and who had, jointly with her husband, made good faith efforts to see the property in order to satisfy the judgment.

In contrast, in this case, Mrs. Solow hired "asset protection" lawyers to strip the equity from the only asset Mr. Solow testified he has. The Florida Supreme Court has held that one spouse may not alienate a portion of the tenancy by the entireties without the consent of the other. *Beal Bank, SSB*, 780 So.2d at 56. Therefore, Mr. Solow needed to consent and actively participate in the stripping of equity from the Hillsboro Mile property. Therefore, Mr. Solow fully participated in the activities that left him allegedly judgment-proof.

Balancing the equities of preserving Mrs. Solow's interest in one of her many luxury homes, bought through the pro-

ceeds of Mr. Solow's business activities, against Mr. Solow's claimed inability to pay the disgorgement to the investors he defrauded, it would not be unreasonable for this Court to have used its equitable powers to prevent the larger inequity.

Finally, as noted above, "[a] party seeking to avoid a finding of contempt must demonstrate that '*all* reasonable avenues for raising funds have been explored and exhausted.'" *Bilzerian*, 112 F.Supp.2d at 26 (emphasis added) (*citing Phoenix Marine Enterprises, Inc. v. One Hylas 46' Convertible Sportfisherman Hull No. 1*, 681 F.Supp. 1523, 1529 (S.D.Fla.1988)). Mr. Solow clearly failed to make such efforts. "Rather, his diligent efforts have been focused on how to avoid compliance with the Court's orders." *Id.* at 27. "Where assets are held in an offshore trust, the 'burden of proving impossibility as a defense to a contempt charge will be especially high.'" *Id.* at 26 (*citing FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239–41 (9th Cir.1999)). If Mr. Solow cannot convince his wife to return his assets to him, "it is a problem of his own making." *Id.* at 28 (*citing Piambino v. Bestline Products, Inc.*, 645 F.Supp. 1210, 1215 (S.D.Fla.1986)).

## VII. Conclusion

Boiled down, Mr. Solow asks the Court to accept that any assets he once held as a tenancy by the entirety with his wife (now transferred solely to his wife's trust) were never reachable by the disgorgement Order, even before the assets were transferred. This argument fails because, according to the Eleventh Circuit, to avoid civil contempt, the alleged contemnor must make all reasonable efforts to satisfy the judgment. Such a requirement commands a different conclusion from that drawn by Mr. Solow.

As the financial transactions in this case are complex, to illustrate why Mr. Solow's argument is unavailing in the civil contempt context, I will offer the following hypothetical situation. Imagine a husband and wife have $10,000 in a joint checking account held as tenants by the entirety. A court enters a disgorgement order against the husband for $5,000. According to Mr. Solow, that joint checking account would not be reachable by the disgorgement order. Yet, the Eleventh Circuit requires this hypothetical husband to make all reasonable efforts to satisfy the disgorgement. Basic logic dictates that, using a very "reasonable effort," the husband could simply open his check book, write a check for $5,000 from his joint checking account, put it in a stamped envelope, and mail it to the Registry of the Court to satisfy the disgorgement. Such an effort is both reasonable and well within the husband's means and control. If the hypothetical husband failed to take these simple steps, a court would be justified in finding him in contempt. An argument to the contrary compels an absurd and inequitable result. Accepting such an argument would encourage people making money from securities fraud to marry, and then put the proceeds in a joint checking account with their spouse.

The Solows (and their attorneys) have worked very hard to give their assets an opaque appearance. They have incorporated the family car. They have incorporated the family home. They have multiple trusts and accounts, both foreign and domestic. Yet, despite the layers of complexity they have added to their assets, Mr. Solow could have made a similar, reasonable effort with regard to the assets he jointly held with his wife. Instead, he consented to sending his joint assets outside of his control and to the other side of the globe.

Importantly, the hypothetical situation also illustrates that *regardless* of whether or not this Court's equitable powers could have reached Mr. Solows assets that were otherwise protected by state law, Mr. Solow still did not make a showing that he made "all reasonable efforts" to satisfy the judgment, thereby making the inquiry in to this Court's equitable power, not to mention the tenancy by the entirety argument, completely irrelevant. As such, regardless of whether or not this Court could have chosen to ignore and bypass the state law protections, as other federal courts have done in similar circumstances, Mr. Solow would *still* be found in civil contempt for failing to make, himself, the reasonable efforts necessary to satisfy the disgorgement. Instead of making a good faith effort to satisfy the disgorgement, his actions, instead, constitute all reasonable efforts to frustrate the disgorgement.

Neither Mr. Solow's testimony nor Mrs. Solow's attorney's testimony rebuts the presumption that all of Mrs. Solow's substantial assets were paid for through Mr. Solow's earnings, given his wife's complete absence from the workplace. In fact, Mrs. Solow's attorney testified that he understands that all of Mrs. Solow's assets are paid for by Mr. Solow. Furthermore, Mr. Solow's testimony reveals that he has *de facto* control of his wife's accounts, directing payments for his personal attorneys.

The Eleventh Circuit adheres to the "time-tested adage: if it walks like a duck, quacks like a duck, and looks like a duck, then it's a duck." *BMC Industries, Inc. v. Barth Industries, Inc.*, 160 F.3d 1322, 1337 (11th Cir.1998).[9] Mr. Solow still lives a luxurious lifestyle, enjoying the benefits of the money he has made over the years, yet

he refuses to repay the victims of his fraud. Such a situation cannot stand.

I find that Mr. Solow executed the Hillsboro Mile mortgage and relinquished other assets to his wife in order to avoid the forthcoming disgorgement order. I further find that Mr. Solow's inability to pay is a situation of his own making. Finally, I find that he has not made, in good faith, all reasonable efforts to pay more than the $2,639.24 that he has paid to date. Therefore, I hold that Mr. Solow is in contempt of the Order of this Court [DE 138], issued on May 14, 2008. Accordingly, it is hereby

ORDERED that Mr. Solow is in CONTEMPT OF THIS COURT. It is hereby further

ORDERED, that Mr. Solow shall surrender to the custody of the U.S. Marshal's Office for the Southern District of Florida, located at the Paul G. Rogers Federal Building and U.S. Courthouse, 701 Clematis St., West Palm Beach, Florida, 33401, by 2:00 p.m. on Monday, January 25, 2010. It is further

ORDERED that Mr. Solow must not leave the Southern District of Florida before surrendering to the custody of the U.S. Marshal's Office on January 25, 2010. It is further

ORDERED that the U.S. Marshals Service shall request designation from the Bureau of Prisons for the nearest appropriate federal facility to West Palm Beach, Florida, for defendant's further incarceration. The Court directs that Mr. Solow be incarcerated in a Bureau of Prisons facility due to the special circumstances of this case. It is further

ORDERED that the U.S. Marshals Office for the Southern District of Florida

---

**9.** The "duck test" has received wide support from the courts. *See, e.g., Hurston v. Director, Office of Workers Compensation Programs,* 989 F.2d 1547, 1549 (9th Cir.1993); *Psarianos v.* *Kikis,* 941 F.Supp. 79, 80 (E.D.Tex.1996); *Loudermilk v. Loudermilk,* 183 W.Va. 616, 397 S.E.2d 905, 907 (W.Va.1990).

shall notify the Court of the fact of Mr. Solow's appearance or non-appearance on January 25, 2010. It is further

ORDERED that Mr. Solow shall remain incarcerated until such time that he has complied with the conditions set forth in this Court's May 14, 2008 Order. It is further

ORDERED that if Mr. Solow does not appear voluntarily by 2:00 p.m., on January 25, 2010, the U.S. Marshals Service shall take him into custody, and to effectuate the arrest, may enter his residence at 4240 Galt Ocean Drive, Unit 504, Ft. Lauderdale, Florida 33308.

### ORDER DENYING MOTION FOR STAY PENDING APPEAL [DE 195] and DELAYING THE DATE OF SURRENDER SO THAT A STAY MAY BE SOUGHT FROM THE ELEVENTH CIRCUIT

THIS CAUSE comes before the Court on Defendant, Mr. Solow's Motion to Stay Pending Appeal and Incorporated Memorandum of Law [DE 195] filed on January 20, 2010. I have reviewed the record and am advised in the premises.

While the law is not entirely settled on the issue Mr. Solow raises in relation to *McGregor v. Chierico,* 206 F.3d 1378 (11th Cir.2000), and property held by tenancy by the entirety, I do not agree that there is a substantial likelihood that Defendant will succeed on the merits on appeal. The Eleventh Circuit has been clear that the inability to pay is not a defense to civil contempt if the contemnor created the inability. *See Hodgson v. Hotard,* 436 F.2d 1110, 1116 (5th Cir.1970); *In re Lawrence,* 279 F.3d 1294, 1300 (11th Cir.2002). After an evidentiary hearing, I found that Mr. Solow's inability to pay is self-created. Further, I found that Mr. Solow has not shown that he has made any substantial efforts to pay the disgorgement, but, instead, he has taken various steps to purge himself of his assets by transferring them to his wife.

Mr. Solow represents in the instant motion that he "is no longer saying he can't pay," and that he will "continue to make efforts to sell the Hillsboro Mile property, to have the Cook Islands Trust dissolved and the $5.2 million mortgage removed and pay the Court." Mr. Solow is correct in that "incarceration should not be ordered on a civil contempt finding because the house has not yet been sold:" a person's liberty is not subject to the ups and downs of the South Florida real estate market. However, Mr. Solow made the same representation about liquidating the Hillsboro Mile property to satisfy the disgorgement to the Court during the First Hearing on Civil Contempt held on August 14, 2009, and nothing has happened.

Moreover, even the August 2009 representation did not come until over a year after the Final Judgment was issued on May 14, 2008, and after he took all the steps to rid himself of his assets. These representations that he will "continue to make efforts to sell the Hillsboro Mile property" do not satisfy the Eleventh Circuit's requirement that the defendant make "in good faith all reasonable effort to meet the terms of the court order he is seeking to avoid." *Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.,* 950 F.2d 1525, 1529 (11th Cir.1992) (internal quotations omitted). There is a difference between making reasonable-sounding representations to the Court and actually making reasonable efforts.

Mr. Solow has been on notice for nearly two years—since the February 6, 2008 jury verdict against him—that he would be liable to the SEC. Mr. Solow has been on notice for over a year and a half—since the May 14, 2008 Final Judgment—of his actu-

al liability. Mr. Solow has been on notice since August 14, 2009 that this Court was concerned over his apparent dissipation of assets, when it warned Mr. Solo that incarceration could be a consequence of the SEC's proving the facts behind it allegations that Mr. Solow is in contempt of this Court's Order.

Mr. Solow has made many representations to the Court of his inability to pay and also of his willingness to pay sometime in the future. The former argument is belied by the history of Mr. Solow's financial transactions: his inability to pay is self-created. The later argument is unavailing because Mr. Solow has had ample time to make efforts to (1) simply pay the disgorgement; (2) avoid taking steps that tie up his assets, or (3) take steps to unwind his assets and make a payment to the Registry of the Court. In all this time, Mr. Solow has done none of those things, despite the commencement of contempt proceedings on July 13, 2009. In sum, Mr. Solow is not purged of contempt by now telling the Court that he will try to pay the disgorgement. Based on Mr. Solow's testimony both at the trial and the contempt hearing, as well as his actions, I do not believe him to be credible.

Mr. Solow has had time to pay the disgorgement while the victims of his fraud continue to wait for repayment. I do not see irreparable injury to Mr. Solow by holding him in contempt. Mr. Solow's alleged injury does not outweigh the injury to the SEC should Mr. Solow not pay the disgorgement, because the disgorgement payments go to the victims of the fraud. Mr. Solow continues to enjoy the fruits of his wrongdoing while his victims face hardship. A disgorgement order is more like an injunction for the public interest than a money judgment. *See SEC v. Huffman*, 996 F.2d 800, 802–03 (5th Cir.1993). The public's interest lies in enforcement of this Court's Order of Disgorgement.

I will move back the date Mr. Solow shall report to the U.S. Marshals by one week so that Mr. Solow may seek a stay from the Court of Appeals. Accordingly, it is hereby

ORDERED AND ADJUDGED that Mr. Solow's Motion for Stay [DE 195] is DENIED. It is further,

ORDERED AND ADJUDGED that Mr. Solow's date of surrender is now **Monday, February 1, 2010 at 2:00 p.m.**